[Cite as *State v. Farmer*, 2024-Ohio-6063.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
JACKSON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 23CA6 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| LARRY JASON FARMER | : | |
| Defendant-Appellant. | : | **RELEASED 12/23/2024** |

_____
APPEARANCES:

Katherine Ross-Kinzie and Melissa Seabolt, Assistant State Public Defenders, Office of Public Defender, Columbus, Ohio, for appellant.

Andrea K. Boyd, Special Prosecuting Attorney, Assistant Attorney General, Ohio Attorney General's Office, Columbus, Ohio, for appellee.
_____
Hess, J.

{¶1} Larry Jason "Jay" Farmer appeals his convictions on attempted murder, felonious assault, and improperly discharging a firearm at or into a habitation. The murder and assault convictions included firearm specifications. Farmer contends that the trial court erred when it failed to instruct the jury on defense of another because he was acting in defense of his father when he fired multiple warning shots. In a related argument, Farmer contends that his trial counsel was ineffective for failing to argue that firing warning shots is not inconsistent with defense of another and for indicating that he would elect an instruction on an inferior degree offense over defense of another. Farmer also challenges his conviction as against the manifest weight of the evidence.

{¶2}  Farmer raises three issues concerning his sentencing. First, he contends that the trial court failed to make the required statutory findings before imposing consecutive sentences. Next, he contends that the trial court erred when it failed to merge the offense of improper discharge of a firearm into a habitation into the other two offenses where there was no actual second victim. Last, he contends that the trial court erred when it imposed a consecutive sentence on the merged count of felonious assault. The State concedes that the trial court failed to make the required statutory findings before imposing consecutive sentences and that the trial court erred when it imposed a consecutive sentence on a merged count. However, the State opposed Farmer's argument that his attempted murder and improper discharge into a habitation should merge because there was a separation in time between the two firing episodes and there were two victims and two separate harms (Goheen and Kisor). Because we find that the trial court failed to make the required statutory findings before imposing consecutive sentences and remand for a new sentencing hearing, Farmer's remaining arguments raising sentencing errors are moot as they can be raised by him and considered by the trial court at the resentencing hearing.

{¶3}  For the following reasons, we overrule Farmer's first, second, and sixth assignments or error, sustain Farmer's third assignment of error, and find his fourth and fifth assignments of error moot. We remand the cause for a new sentencing hearing.

I.  FACTS AND PROCEDURAL HISTORY

{¶4}  The Jackson County grand jury indicted Farmer on one count of attempted aggravated murder and one count of felonious assault, both with firearm specifications, one count of improperly discharging a firearm at or into a habitation, one count of

intimidation of attorney, victim or witness in criminal case, and one count of retaliation against a witness. The intimidation and retaliation counts each had firearm specifications. The charges arose out of a dispute over a 1999 Dodge Truck. Farmer pleaded not guilty to all counts. Prior to trial, the State amended the indictment to change the attempted aggravated murder count to attempted murder and the trial court entered an order of nolle prosequi on the intimidation and retaliation counts.

{¶5} At trial, Chief Deputy Scott Conley of the Jackson County Sheriff's Department testified about the shooting incident that occurred on June 17, 2021 involving Jay Farmer. He and Lieutenant Zinn were informed by dispatch that there were shots fired at an address in Glenroy, Ohio and they went to the scene. Another deputy had also arrived just prior to Conley and Zinn's arrival. The three of them approached the residence and spoke to Steven Kisor outside the doorway, who told them that two subjects had been shooting and had shot at the residence, which was a trailer, and fled. Kisor seemed "sweaty" and "pretty worked up" over the events. The officers began searching for casings and other evidence from the weapons that were fired. They located several rounds in the driveway area and yard, which Lt. Zinn photographed. They also recovered a bullet out of the trailer and the vehicle parked in front of the residential trailer.

{¶6} Deputy Conley testified that Kisor told officers he had a video of the entire conflict. Deputy Conley summarized the video's content as it was shown to the jury. According to Conley's summary, the video showed a truck pull up and two men exit the truck. Deputy Conley identified the two men as Larry E. Farmer, Sr. ("Larry") and defendant Larry Jason Farmer, Jr. ("Jay"). Because the father and son shared the same name, witnesses and counsel referred to the defendant as "Jay" Farmer throughout the

record. Deputy Conley narrated the video as it was played for the jury, explaining that Larry exited the vehicle and had a handgun in his right hand. Larry handed the gun to defendant Jay Farmer, as Jay Farmer sat in the passenger side of the vehicle, facing the residence. Steven Kisor came out of the residence. What appeared to be a handgun was "pointing over the frame of the truck." Kisor and Larry appeared to be arguing when defendant Jay Farmer exited the vehicle. Kisor had a baseball bat and he hit Larry while Jay Farmer stood out in the driveway pointing a gun. Deputy Conley testified that the video showed Jay Farmer firing two shots and Kisor running away from them, then Jay fired two more shots. Larry appeared to have a handgun in his right hand and approached Kisor, who at this point had grabbed a beer keg to use as a shield. Larry "launches at Kisor with a gun pointed at his upper part of his body." Jay Farmer was facing the residence and appeared to have a handgun in each hand. Both Larry and Jay were going toward the residence, not retreating. Deputy Conley testified that Jay Farmer did not appear panicked and walked back to the vehicle.

{¶7}    The video, which was marked State's Exhibit 1, was divided into 10, 30-second segments. The video shows the front yard and driveway of the residential trailer because the phone camera was recording out a front window of the trailer. A grey-beige pickup truck with its bed facing the camera, tailgate down, is on the right side of the screen. The grey-beige truck has a beer keg sitting on the end of the truck bed. Approximately 3 feet behind the truck bed, lying on the ground at the bottom right portion of the scene, appears to be a wooden 4 x 4 post. Larry and Jay Farmer's dark grey truck is facing cab forward and parked next to the grey-beige truck approximately 10 feet away and on the left side of the screen. The Farmers are sitting inside their dark grey truck. In

video segment 1, Larry gets out of the driver's side of his truck. In video segment 2, after Larry gets out of the truck, he takes a gun from his back pocket area with his right hand and then places it back in his back pocket area. Larry walks to the residence and exits the screen to the left, leaving his driver's side door open. Jay Farmer stays in the passenger side of the truck.  In video segment 3, the two trucks are shown, Jay is sitting in the truck and no other activity is recorded. In video segment 4, there are indecipherable voices of several people talking, but no other activity.

{¶8}    In video segment 5, Larry enters the left side of the screen, walks to Jay who is sitting in the passenger side of the truck, and hands Jay what appears to be his gun. Larry exits the scene left again and Jay remains seated in the truck. Next Larry and Kisor come walking into the scene together from the left. Jay reaches outside the truck and extends his arm to the front windshield and trains a gun at Kisor as Kisor walks between the Farmer truck and the grey-beige truck. Larry follows behind Kisor. Kisor is carrying a bat in his left hand and raises his right hand and points towards Jay as Kisor walks past the Farmer truck's open driver's side door. In video segment 6, Kisor and Larry continue to walk between the trucks and away from the trailer, with Larry following behind Kisor. Kisor twirls and swings a slender bat in his hand as he walks. Both men stop at the end of the trucks (the bed of Farmer's truck and the cab of the grey-beige truck), face each other and argue in an animated manner. Jay Farmer gets out of the passenger side of the truck, walks to the back of the dark grey truck and stands behind his father, facing Kisor. While Larry and Kisor argue, Kisor twirls the bat in his hands and Larry steps, extends, and reaches his arm back towards Jay. Kisor is continually retreating and Larry is advancing towards him as the two argue. Larry walks forward towards Kisor, raises his

arms, and closes the gap between them. As that occurs, Kisor takes a swing at Larry, striking him once on the head/neck area. After Kisor swings and hits once, he immediately retreats, taking three to four steps backwards. Jay comes into full view from behind the Farmer truck bed and advances forward, with his arm fully extended and the gun pointed at Kisor and immediately takes four shots, which appear to be directed at Kisor. Kisor continues his retreat more quickly to the far side of the grey-beige truck and comes up behind it so he is at the open tailgate, and farthest from Jay and Larry.  The only weapon Kisor appears to have in the video is the bat and then later the beer keg. After firing the four shots in quick succession, Jay Farmer retreats to the passenger side of the Farmer truck and gets into the passenger side again. Larry continues walking between his truck and the grey-beige truck towards Kisor, rubbing his neck where he was struck while he resumes his advance towards Kisor.

{¶9}   Footage between events in segments 6 and 7 is missing. In video 7, initially only the two trucks are in the scene. The wooden 4x4 post no longer appears in the bottom right area of the scene. A few seconds into this segment, Jay Farmer appears from behind the Farmer truck bed, walking towards the right of the scene carrying a handgun in each hand, and exits the scene on the right. Jay then re-enters the scene from the right, carrying one gun, and turning and looking behind him towards the right as he walks. Jay positions himself between the two trucks and points his gun towards the right of the scene and fires a shot towards the right side of the scene. Jay then positions himself behind the open driver's side door of the Farmer truck and continues to train his gun towards the right side of the scene. Kisor is not yet in the scene but Larry has entered the scene from the right, holding a gun in his right hand. Immediately after Jay fires a

shot, Kisor runs into the scene from the right and retreats to the rear of the grey-beige truck. As Kisor runs into the scene, Larry steps forward, raises his arm, takes aim, and fires a shot directly at Kisor, who jumps and dashes behind the grey-beige truck. Kisor grabs the beer keg from the bed of the grey-beige truck and holds up the keg and bat in front of him. Larry advances towards Kisor with his gun trained on Kisor and appears to try to fire at Kisor while Kisor again attempts to shield himself with the keg. In video segment 8, Larry advances close to Kisor and points his gun at Kisor at close range, who stands shielded in part by the keg. Larry then walks around the cab portion of the grey-beige truck and towards his truck. He hands off his gun to Jay and retrieves a 4x4 wooden post from the ground between the two trucks and advances towards Kisor with the post. Kisor retreats to the right side of the screen and exits the scene. Larry stands at the edge of the right side of the screen, apparently facing Kisor. Then the beer keg suddenly enters the scene and appears to have been thrown at Larry's feet by Kisor. Larry skips to avoid the beer keg, quickly advances towards Kisor, and moves to the right and out of the scene, carrying the post. In video segment 9, initially only Jay Farmer is in the scene. He walks from the right side of the scene to the passenger side of his truck and gets in. Larry returns into the scene from the right side, carrying the 4x4 post, and walks to the driver's side of his truck, drops the 4x4 post, gets in, puts the truck in reverse, slowly backs out, and begins to drive away to the left. In video segment 10, the Farmers continue to drive slowly away. Kisor does not reenter the scene.

{¶10} Deputy Conley also testified about certain photographs of the scene. There was a photograph of numbered, yellow placards that marked the location where spent casings were in the drive and grass area. Another photograph depicted the bullet hole

where a bullet had entered the residential trailer. Deputy Conley also identified a photograph depicting a bullet hole in the hood of the grey-beige pickup truck. Deputy Conley testified that he spoke to Kisor at the scene the day of the incident, but no other persons were at the residence when he spoke with Kisor. Deputy Conley obtained Kisor's permission to enter the trailer and located the bullet. As he did so, he scanned the interior but did not see anything of relevance and did not see any firearms. Deputy Conley testified that the baseball bat Kisor had in the video was never located.

{¶11} Marcus Goheen testified that he was renting the residential trailer where the incident occurred from his grandfather and had been living there for approximately five years. Goheen testified that the day of the incident, he had gone to the kitchen and noticed there was someone outside so he went to the door and the person, who he later learned was Larry Farmer, asked if Kisor was there. Goheen had never met either Larry or Jay Farmer before. Goheen said that both men were asking for the keys to a truck. Goheen went and got Kisor, who was in the spare bedroom. Kisor looked out and told Goheen he knew them and that he would get his boots on and go out. Goheen then went outside and informed them that Kisor would be out. Goheen testified that he also "tried to deescalate the situation cause I noticed that . . . uh . . . the older Farmer had had a pistol and he was worried about [Kisor] having a pistol so I informed him that [Kisor] didn't have one. He could put his up and I'd have him come out and that's what he agreed to do." However, Kisor grabbed a BB gun, which was "a pistol, solid black, .9 mm look alike" and a ball bat and went outside. Goheen testified that the surveillance camera was always running so it captured what happened.

{¶12} Goheen testified that Kisor hit Larry with the bat and then gunshots went off and Goheen turned and locked the door and fled diagonally away from the trailer. He could hear Kisor shouting obscenities and the sound of gunshots and the Farmers firing at Kisor and towards the trailer. Goheen saw the Farmers drive away and he went back to see if Kisor had been shot and was lying in the yard. He did not find Kisor in the yard and decided to leave the scene. Goheen testified that when Larry first came to the door asking about Kisor, he told Goheen, "well let him know that I'd like to have the keys to my truck or I'm taking the keys of my truck with me or I'm going to kick his ass." Goheen assumed that meant that Larry "was going to beat [Kisor] up." Goheen also testified that as Kisor went out to meet the Farmers, Kisor told the Farmers, "if . . . uh . . . you bitches want to play with guns, we can play with guns, I got one too."

{¶13} Steven Kisor testified that he knew Jay Farmer and identified Jay in the courtroom. Kisor testified that he was renting the trailer where the incident occurred. Kisor testified that he had been renting the trailer for about three months prior to the incident and continued to rent there after the incident. Goheen had knocked on his bedroom door and informed him that two men with guns were there and that one of them wanted to fight. Kisor thought that the Farmers were there to talk about the dispute over the 1999 Dodge truck because they had text-messaged him. Kisor got a baseball bat and went outside. Kisor testified that he did not get a gun and had no firearms on him when he went outside. When he went outside, Kisor walked down the side of the truck and called Jay a " 'pussy' and said he wasn't going to fight." Kisor saw Larry pass a gun off to Jay. When Kisor went outside, Jay was in the passenger side of the truck and was pointing a gun out the window and across the windshield at Kisor. Kisor testified that at no point had Kisor pointed a gun

at Jay. Kisor testified that he believed the gun Larry handed to Jay was a .9 mm semi-automatic and Jay had a different black semi-automatic pointed at Kisor. In response to Jay pointing the gun at him, Kisor said, "you got a gun on me, you're going to use it pussy." Kisor went in front of the grey-beige truck, which he testified he owned, and argued with Larry, who did not have a weapon at that time. Kisor testified that he was swinging the bat while arguing with Larry and told him "if he reached for the gun that's when I'm going to hit you." Kisor explained that though Larry did not have a gun on him, there was a gun on the bumper on the tailgate of the truck and "I'm swinging it [the bat] telling him if he touched that gun I'm going to hit you."

{¶14} Kisor explained that the incident was recorded by an old cell phone that was being repurposed as a security camera. The camera phone was motion activated. Kisor's testimony walked through the security camera video. As Kisor walked out between Larry's truck and Kisor's grey-beige truck, he saw Jay point the gun at him. Kisor testified that he went out into the yard and called Jay a pussy because he did not think they were planning to use their guns. Kisor testified that he had a bat in one hand and was flipping them off with his other hand. Kisor was swinging the bat around to keep Larry from getting close to him. Larry told him to "drop a bat and take it like a man." Kisor did not drop the bat and engage in a fist fight with Larry because Jay had already exited the truck and had Kisor at gunpoint. Larry reached back and tried to get the gun from Jay and then reached for Kisor's bat. At that point, Kisor hit Larry. Jay began shooting at Kisor, not into the air. At that point, after Jay fired, Larry got his .9 mm gun from the back of the Farmer truck.

{¶15} Kisor explains that there is a gap in the video between video segment 6 and 7 because the camera is motion activated and it goes on 30 second increments, "so it

had a breach or something." Kisor testified he emailed all the footage he had to Lt. Zinn. After Jay fired at Kisor, Kisor ran around to the side of the trailer and around a flagpole next to the house with Larry advancing closely behind him. Larry was armed at the time with the .9 mm and then there was a popping noise. Kisor testified that the popping noise was Kisor hitting Larry's hand with the bat. At that point, both Jay and Larry fired shots at Kisor. Jay went back to the Farmer truck and pointed his gun at Kisor, and Larry talked to Kisor while standing at the right side of the truck with a gun. Kisor testified that Larry tried to shoot at Kisor again but his gun jammed; Kisor heard the gun click but it did not fire. Larry handed the jammed gun to Jay and grabbed the 4x4 wooden post. Kisor ran around the back side of the trailer and entered the trailer from the back and into the room where the camera was. The sound of the loud breathing on the video was Kisor's breathing. Kisor did not see Goheen again that day. The Farmers drove away. Kisor testified that he left the bat outside on the side of the trailer. After the Farmers left, law enforcement showed up.

{¶16} Kisor testified about enlarged photographs from the video footage. Kisor testified that the photograph showed him flipping off the Farmers. Kisor testified that he never had a gun in his hand and that he had a bat. Kisor testified that the enlarged photograph of his back pants pocket showed that he probably had something in his back pocket, but it was not a gun. Kisor testified that he attempted to use a beer keg as armor, but it did not work well and was heavy.

{¶17} Kisor also testified about Facebook Messenger posts between Kisor and Larry earlier in the day of the incident, which are peppered back and forth with veiled threats about the dispute over the 1999 Dodge truck. A copy of the Facebook Messenger

exchange was introduced by the State as evidence. The exhibit shows that Larry called Kisor a "motherfucker" and a "pussy" twice during the posts, but Kisor did not engage in similar name-calling back. The substance of the posts were that Larry asked Kisor about the truck and Kisor told him that its Kisor's truck but he would sell it to Larry for $7,000. Larry instructed Kisor to meet him at the store and Kisor responded that he will as soon as he gets back into town. However, they never agreed to meet anywhere that day, and Kisor was not expecting them to show up at the trailer. Kisor testified that the Farmers were not welcomed, and he wanted them to leave. He testified he hit Larry with the baseball bat, "Because I was at gunpoint, I thought I was gonna get shot" and Larry was close enough to grab the bat and had made threats against Kisor.

{¶18} On cross-examination, Kisor reiterated that Larry did not have a gun in his hand when Kisor hit him with the bat, but that Jay was standing behind Larry and was pointing a gun at him and Larry was reaching back and trying to grab the other gun.

{¶19} Dustin Oddo, a forensic video analyst for the Ohio Attorney General's Office, Ohio Organized Crime Investigation Commission, testified about his work experience and training. Oddo extracted still images from the video recordings of the incident and enlarged them, as well as clarified the audio of the video. The clarified audio was matched to the video as part of the video segments introduced at trial. Oddo also compiled the ten separate video segments into one continuous video and inserted a "black slate" in the segment where there is "some sort of leap in time" between two of the segments. Oddo was unable to determine whether the break in the recording was a result of an error in the equipment or if a segment was withheld. Oddo explained that a motion sensitive camera will wait until it detects motion to start recording. Sometimes with those

types of cameras it will detect motion, record, and then "there's almost sort of like a cool down period between when that recording ends and when another can pick up . . . and sometimes it's continuous."

{¶20} Urias Hall, a deputy sheriff with the Jackson County Sheriff's Office for 43 years, worked in "evidence tech and crime scene." In these roles, he records all evidence into logs and goes to crime scenes and collects and processes evidence. Deputy Hall took photographs at the trailer and placed placards where shell casings were found. Deputy Hall also photographed the bullet hole in the trailer, the bullet hole in the grey-beige truck that was parked in front of the trailer, and a wooden beam with blood marks that was lying in the driveway area. Deputy Hall testified that the shell casings were found in front of the trailer in the driveway and yard area. He identified one of the shell casings as "a Win .9 mm" and the other five shell casings as "Hornaday .380 caliber casings." Deputy Hall photographed the bullet hole on the interior of the trailer, in the bedroom drywall, and bullet damage to the window seal, as well as the bullet, which had fallen below. In addition to the number of shell casings found, Deputy Hall recovered two spent bullets from the scene, one from the truck and one from the trailer.

{¶21} Lieutenant Rick Zinn of the Jackson County Sheriff's Office testified that he was working as a detective in May 2021 when he began investigating "some kind of insurance plan that was made regarding Larry Farmer."[1] Lt. Zinn's insurance investigation started after he heard rumors that Kisor was living in a stolen camper with a woman. Lt. Zinn went out there to respond to a domestic violence incident and asked the woman if he could run the VIN number on the camper and it came back as stolen. The camper was

---

[1] There was no clarification as to whether the "Larry Farmer" was Larry, Sr. or Jay Farmer. However, from the context given in later testimony, it would appear likely that it referred to Jay Farmer.

towed to the sheriff's impound lot. Kisor was arrested and charged with domestic violence and Lt. Zinn interviewed Kisor. After talking with Kisor, law enforcement reached a deal with him that required Kisor to work as a confidential informant and, in exchange, Kisor would receive community control.

**{¶22}** Based on information Kisor provided, Lt. Zinn recovered a second stolen camper in Adams County, Ohio and executed a search warrant on a garage at Jay Farmer's residence. Law enforcement located items stolen from the stolen camper inside the Farmer's garage. Jade Farmer, Jay Farmer's wife, gave law enforcement access to the garage when presented with the search warrant. Lt. Zinn also spoke with Jade Farmer in a recorded interview. Lt. Zinn testified that, prior to the June 17, 2021 shooting incident at the trailer involving the Farmers and Kisor, Zinn had picked up Kisor from the trailer on June 8 and 9, 2021 when he picked up the stolen camper in Adams County and when he executed the search warrant on the Farmer's garage. It was Lt. Zinn's understanding that Kisor lived at the trailer where the June 17 incident occurred.

**{¶23}** Lt. Zinn also responded to the June 17 shooting incident and interviewed Kisor at the trailer. Kisor showed Lt. Zinn the video recording off the phone and said that "he'd been shot at by . . . uh . . . the Farmer's, Larry E. and Larry J. and . . . uh . . . we began looking around." Based on the investigation, Lt. Zinn filed criminal charges against the Farmers. Lt. Zinn testified that he did not collect the cell phone that contained the video because Kisor emailed the videos and Kisor "was a victim, so I didn't have any reason to seize it to search for further evidence."

**{¶24}** On cross-examination, when asked whether he was aware of Kisor's reputation for truthfulness in the community, Lt. Zinn testified, "The man's always been

honest to me" and he was not aware of a reputation about Kisor's truthfulness. Lt. Zinn testified that when he arrived at the trailer to investigate the active shooter situation on June 17, 2021, he searched the interior of the trailer for bullets. He also searched for a baseball bat and was unable to locate it. Lt. Zinn also did not see any evidence of a BB pistol that looked like a .9 mm at the scene.

{¶25} The State rested its case and the defense called several witnesses.

{¶26} Jade Farmer testified that she was married to Jay Farmer and they operated a transport business, transporting campers, trailers, boats, etc. Jade testified about the 1999 Dodge Truck that was at the center of the dispute between the Farmers and Kisor. Jade testified that Steve Kisor first started working for her in the late summer or early fall of 2020 and he started driving for their transport company in November 2020 until approximately March 2021. Jade testified, "[T]here was never really like a[n] official 'you're fired' kind of deal but he . . . I had no need for him anymore and so, you know, he couldn't take off in my truck like he liked to do. And so, he just stopped coming around and we . . . you know, talked occasionally as you do with anybody you know." Jade testified that Kisor stayed in a camper that was parked in front of the garage at the Farmer's residence while he was working for them. "Like, he never paid rent. He was never a resident but he'd stay and he'd come and go as he pleased and sometimes he was there and sometimes I didn't see him for three weeks."

{¶27} Jay Farmer testified in his own defense. He became acquainted with Steven Kisor after someone recommended Kisor as a "great mechanic." Jay Farmer asked Kisor to come over in April 2020 and look at a truck Farmer was having problems with. After the Farmers started the transport business, they hired Kisor to perform maintenance

routinely on their vehicles. Kisor also lived in the Farmer's camper from time to time and had full access to their garage and tools. Kisor began hauling for the Farmers in November 2020.

**{¶28}** Jay testified about the 1999 Dodge truck that was the center of the dispute with Kisor. Jay testified that on June 17, 2021, he and his father Larry drove Larry's truck to the trailer where Kisor was staying to get the keys to the 1999 Dodge truck and possibly the truck from Kisor. Jay testified that he had a .38 firearm on him and his father had a .9 mm firearm.

**{¶29}** Jay testified that Marcus Goheen came to the door when they arrived at the trailer. Larry went up to the door and asked Goheen if Kisor was there. Eventually Kisor came to the door. Jay testified that his dad handed his .9 mm handgun to Jay. Jay testified that Kisor appeared to have a baseball bat and a .9 mm black handgun in his hands. Jay testified that as Kisor came around the side of the truck, Kisor pointed a gun at him and so Jay reached out and pointed his gun at Kisor. Jay said that Kisor was pointing a gun at him while Kisor was still on the porch (which is outside the frame of the security footage) and then as he walked past the driver's side door of the truck. Jay was pointing his gun back at Kisor. Jay got out of the truck because he saw Kisor waving a bat around and he knew his father was unarmed and he didn't want his father to get beaten with the bat. Jay denied that he brought his father's gun with him as he left the truck or that it was in the bed of the truck or bumper of the truck. Jay said that his father and Kisor were engaged in "a cussing match." And then he saw Kisor hit his father with a baseball bat. He thought his father could have died so "I fired some warning rounds." Jay denied trying to hit Kisor with the shots.

{¶30} According to Jay, after the shots were fired, Kisor ran away and towards the back of the grey-beige truck. Jay testified that after he fired the shots, he walked back to the truck, retrieved his father's gun, and walked over and handed it to him. However, during that time, Kisor hit his father in the head a second time. After his father was hit a second time, Jay handed his father the gun and his father brought up the gun. Jay testified that the gun did not jam and Jay walked over to the driver's side door. Jay could not see the gun that Kisor had. Jay was standing in the driver's side door and had his gun trained on Kisor, but did not shoot him because he did not want to hurt him. Jay testified that he and his father made no plans to attack Kisor and did not have discussions about using firearms on Kisor. Jay did not know how there came to be a bullet hole in the trailer because he and his father had no plans to shoot the trailer. Jay identified a photograph of Larry that he testified was taken of his father that depicts what Larry looked like immediately after the fight with Kisor. However, Jay testified that he was not present when the photograph was taken. Jay testified that his father had a hole in his face that went all the way through his cheek. After they left the trailer, they went back to Jay's property, Jay got into his car and drove away. After he learned there were criminal charges, he turned himself into the Jackson County Sheriff's Office.

{¶31} On cross-examination, Jay testified that he did not take his father to the hospital for the injuries he incurred during the incident. Jay also agreed that there was a metal ping sound at the moment he claims his father was hit the second time with the bat. Jay also testified that he did not report the incident to the police. When they left the scene, they did not drive to the Wellston police department or the Sheriff's Office. Jay also testified that he did not know what happened to either his .380 gun or his father's .9 mm

gun. Jay testified that when he exited his father's truck and got into his car, he left his gun in his father's truck. Jay testified that the video of the incident was accurate, that he did not report any incidents of Kisor ever threatening him to the police, and that other than Goheen, who answered the door, nobody else was with Kisor that day. Jay agreed that he was angry at Kisor because of the search warrant that was executed at Jay's home, because his wife was questioned by the police, and because the 1999 Dodge truck was taken from his home. Jay testified that he could not recall what his father said when he approached the door of the trailer. Jay also admitted that he did not know what Kisor did with his gun after he pointed it at Jay. However, Jay also testified for the first time during cross-examination that Kisor had the gun out and was pointing it at his father during the gap in the video.

{¶32} Jay testified that after his father pointed the gun at Kisor, his father did not pull the trigger and the gun did not jam, but that his father nevertheless handed off the gun to Jay and picked up the 4x4 post to brandish instead. Jay testified that he shot his gun five times during the course of the incident, but he shot them as warning shots that he fired off to the side of Kisor. Jay also testified that the enlarged photograph accurately depicts him reaching around and aiming his gun at Kisor before Kisor and Larry enter the picture.

{¶33} Jay testified that at the point that he saw Kisor come out of the trailer with a gun, both he and his father could have left the premises and driven off. But they decided to stay and attempt to get the truck keys. Jay testified that one of the enlarged photographs depicts a gun that Kisor had in his right hand. Jay testified that Kisor had the gun aimed at Jay's face and Jay had his gun aimed at Kisor. Jay admits that in the

remaining enlarged photographs, Kisor is holding a bat in his right hand and there is nothing in his left hand. Throughout the incident, Jay is asked various times whether he and his father could have gotten into their truck and left, and each time Jay testified that they could have left at any point.

{¶34}  Jay also testified about various stages in the video. He testified that in one of the clips, Kisor is backing away from Jay's father and as he backs away he is swinging the bat. Jay testified that if someone is walking away swinging a bat it would tell him that if you come at me, I'm going to swing this bat at you. Jay testified that the video shows Kisor backing away from Larry while swinging the bat, and Larry advancing towards Kisor during this same time with his hands upwards and then Kisor swings the bat and hits Larry. Jay testified that at this point he fired warning shots, but not just one warning shot and not up in the air. Jay testified that Kisor ran away when Jay fired shots. Jay conceded that there was nothing stopping him and his father from getting in their truck and driving away.

{¶35}  Instead, Jay went to the truck and retrieved his father's gun and walked towards Kisor and his father. Jay handed the gun to his father after Kisor hit his father with the bat a second time. Jay also testified that he shot at Kisor a second time:

Q: And right there in that video, you shot at Steve, didn't you?

A.  Uh . . . yes

Q. Okay, You weren't shooting down Center Street then, were you?

A. I mean, I didn't shoot straight towards him, no.

Q. Okay. Well, I mean, obviously you missed him. We all agree on that. Okay. But you weren't shooting down Center Street when you fired that round, were you?

A. I don't think so. I . . . I don't remember.

Q. You weren't firing a warning shot at Steve at that point were you?

A. Yes.

Q. Oh, you were.

A. Yes. I never intended to hurt him or harm him.

Q. And . . . and in that same . . . same video there, your dad also fired a shot, correct.

A. Mmhmmm. . .

Q. And he was firing at Steve.

A. I guess.

Q. Is that right? Was he firing a warning shot?

A. I . . . I assume so.

{¶36} A jury found Farmer guilty of all counts and specifications. At the sentencing hearing, the trial court merged the attempted murder, count one, and felonious assault, count two. Specifically, after discussing the sentencing ranges on counts one and two, the court found "counts one and two merge."  A few moments later, the State confirmed this, "Judge am I correct that count 2 merges?" and the trial court affirmed, "Count 2 merges." However, when the trial court proceeded to sentence Farmer on counts one and three, which the trial court did not merge, the court appears to misspeak and states: "The court has conducted the merger analysis. Counts one and two [sic] do not merge, the court find they're separate harms on those counts." Ultimately the trial court sentenced Farmer as follows:

> We have a gun spec to count one and count 2. . . . you would receive a
> sentence of three years on each spec. They would be served consecutively

for a total of 6 years. . . . Count 1, which is the attempted murder . . . The court is going to sentence you to a six to three year sentence on count 1. Count 2 is felonious assault. That is a felony of the second degree with a possible range between two to eight years. . . but counts one and two merge.  Count 3 is the discharge of a firearm into a habitation. The court finds . . . that count does not merge. And Count 2[2] [sic] as a felony of the second degree with a two to four sentence range. . . The court will do a four to two year sentence. So on counts one, two and three, we'd be looking at a[n] indefinite sentencing range between ten and thirteen. If I've done my math correctly.

Kinsler:         Judge am I correct that count 2 merges?
Judge:          Count 2 merges.
Kinsler:         Okay. And you said six on count 1 . . .
Judge:          . . . six. . .
Kinsler:         . . .  and then on count 3 you said . . .
Judge:           . . . four . . .
Kinsler:         . . . four . . .because it breaks into four to six, right?
Judge:            It's four to .  . .
Kinsler:         . . . understood, Your Honor.

Judge:          So, my understanding is the bad time credit on multiple counts is a cumulative, but we take it from the highest count. So that's where I'm saying there could be an additional three years of bad time credit that's …that's where I get the ten to thirteen. But then there's the additional six year on the firearm specs. So, we're looking at a . . .and this time is all mandatory time, so by my calculation it would be a sixteen year sentence with possible additional three years of bad time credit. Does the State have corrections or additions to the court's math in that regard?

Spitzer:         I don't believe so, Your Honor, no.
Judge:          Okay. Does the defense have additions or corrections to the State's math?
Boulger:        No, Your Honor, we don't.

**{¶37}** The trial court then discussed sentencing factors and found that "counts one and three would be served consecutively, necessary to protect the public. The harm is so unusual or great that a single term does not adequately punish." The trial court addressed postrelease control and instructed: "You could be returned to prison for up to nine years for each violation of rules or your stated of [sic] prison term equals or exceeds eighteen

---

[2] Again, the trial court appears to misspeak and refer to count 3 as count 2.

months." Shortly thereafter an Adult Parole Authority officer spoke up and stated, "You told him he could be sentenced for nine years; it should be nine months." The trial court corrected it to nine months. The court also issued a no contact order between Farmer and the victim.

{¶38} In the sentencing entry that issued following the hearing the trial court did not reflect the merger of counts one and two. Instead, merger was addressed as follows: "The Court finds that merger under R.C. 2941.25 does not apply to any other counts. The Court finds that Count 3 do[es] not merge under R.C. 2941.25 for purposes of final conviction and sentence." The sentencing entry reflects the following sentences: (1) Count one - 6 to 3 years; (2) Count two – 4 to 2 years; (3) Count three – 4 to 2 years. It further states, "Aggregate Minimum Term: 10 TO 13 YEARS. Maximum Term: 10 TO 13 YEARS." The aggregate terms were stated, "Sum of consecutive terms for specifications (add to stated prison term): 6 YEARS. Stated Prison Term (Includes sum of any specifications): 16 TO 19 YEARS."

{¶39} Farmer appealed.

## II.  ASSIGNMENTS OF ERROR

{¶40} Farmer presents six assignments of error:

1. The trial court erred when it failed to instruct the jury on defense of another. R.C. 2901.05(B)(1), *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, *State v. Harvey,* 4th Dist. Washington Nos. 21CA3, 21CA4, 2022-Ohio-2319. (Vol III, T.p. 710-735; 10/6/22 Jury Instructions).

2. Trial counsel was ineffective when he failed to argue that firing a warning shot is not inconsistent with defense of another, violating Larry Jason Farmer's rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. (Vol. II, T.p, 695).

3. The trial court erred in failing to make the required findings under R.C. 2929.14(C)(4) at Mr. Farmer's sentencing hearing prior to imposing consecutive sentences of imprisonment. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659; R.C. 2929.14(C)(4) (Vol III, T.p. 809-810; 01/06/23 Uniform Sentencing Entry).

4. The trial court plainly erred when it failed to merge allied offenses of similar import and thus imposed more prison terms than authorized by law. State v. Ruff, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892; R.C. 2941.25 (T.p. 808; 1/06/23 Uniform Sentencing Entry).

5. The trial court erred when it included a concurrent sentence for a merged count in the judgment entry. (1/06/23 Uniform Sentencing Entry).

6. Farmer's convictions were against the manifest weight of the evidence. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution. (Vol III, T.p. 791-792; 10/06/22 Judgment of Conviction).

## III. LAW AND ANALYSIS

### A. Jury Instructions

**{¶41}** Farmer contends that the trial court erred when it failed to instruct the jury on defense of another. He argues that the "warning shots" he fired were to defend his father and both he and his father met the criteria for self-defense.

### 1. Standard of Review

**{¶42}** A trial court has a duty to provide the jury with full and complete instructions, and we review a trial court's refusal to give a requested jury instruction under an abuse of discretion standard:

A trial court generally has broad discretion in deciding how to fashion jury instructions. However, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." "Additionally, a trial court may not omit a requested instruction, if such instruction is 'a correct,

pertinent statement of the law and [is] appropriate to the facts * * *.' " "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." (Citations omitted.)

*State v. Kelly*, 2021-Ohio-2007, ¶ 13 (4th Dist.). " 'An abuse of discretion connotes more than a mere error of judgment; it implies that the court's attitude is arbitrary, unreasonable, or unconscionable.' " *Kelly* at ¶ 14, quoting *State v. Ables,* 2012-Ohio-3377, ¶ 9 (4th Dist.), citing *State v. Adams,* 62 Ohio St.2d 151, 157 (1980). However, we review "whether a claim of self-defense [or defense of another] is subject to the sufficiency-of-the-evidence standard de novo." *State v. Palmer,* 2024-Ohio-539, ¶ 16.

### 2. Jury Instruction on Defense of Others

**{¶43}** The State, defense counsel, and the court discussed jury instructions several times. Both the State and defense counsel informed the trial court that they would each submit proposed jury instructions, and the trial court agreed to compare them. Defense counsel then raised the issue of defense of another, and the trial court initially appeared favorable to it.

**{¶44}** Following the close of all evidence, the trial court discussed jury instructions again. Before the parties presented arguments, the trial court stated that it had done some research to determine "as a matter of law whether or not the defense is entitled to the instruction" because it anticipated this argument. The trial court stated, "Uh . . . there's some evidence if the jury would choose to believe it that there could be defense of another." The trial court did not discuss the evidence that might support a defense of another jury instruction and later, following more discussion, decided the instruction was not warranted. The State argued that because Farmer testified he only fired warning

shots, and did not shoot at Kisor, Farmer did not have the mental state and did not use deadly force against Kisor, "The defense can argue as . . . Farmer took the stand and stated that he was not shooting at Steve Kisor but therefore he wasn't acting in self-defense i[n] that he wasn't shooting at him at all. . . . the mental state and the act are negated therefore there's no need to discuss that for an affirmative defense . . . such as self-defense because he wasn't using deadly force." In other words, if Farmer was only firing warning shots away from Kisor, then he wasn't using deadly force against Kisor in defense of his father. The State also argued, that in the affirmative defense of defense of another, Farmer steps into the shoes of his father. Farmer's father, Larry, was "at fault in creating the situation. In fact it was his father who advanced on Steve Kisor with his arms that led Steve Kisor to hit him." Larry "showed up spoiling for a fight" and flashing a gun.

{¶45} The State also argued that the Farmers had a duty to retreat because they were unwelcomed trespassers. "If it's Marcus Goheen's house, they so frightened him, he ran away . . . and they were trespassers. . . . If it was Steve Kisor's place . . . they showed up there threatening him and trying to fight him . . . and again they are trespassers in a place they weren't legally entitled to be therefore they had a duty to retreat."

{¶46} Defense counsel responded to the State's first argument by arguing that Jay Farmer said he used the threat of deadly force to ward off an assault upon his father. The trial court and defense counsel then discuss whether threatening to use deadly force constitutes the act of defense of another. When asked what the case law says about something like warning shots, the defense counsel stated that he did not have an answer in the case law. After acknowledging that he did not find an answer, defense counsel pivots and argues that such behavior constitutes "aggravated menacing and I think it

ought to be instructed in lieu of the self-defense instruction frankly, as an inferior degree of when it comes to felonious assault" such that if the jury finds "that the State has failed to prove the elements of felonious assault . . . then they may consider whether or not the State has proven the elements of aggravating menacing causing serious apprehension of serious physical harm." Defense counsel indicated that he had case law supporting this argument. After more discussion between the State and defense counsel, the trial court stated that it was not convinced Farmer was entitled to the aggravating menacing instruction.

{¶47} The following morning further discussions about jury instructions were held off the record. The aggravated menacing instruction was given, but the defense of another instruction was not. Neither the State nor defense counsel made any objections to the jury instructions.

{¶48} R.C. 2901.05(B)(1) states:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

This statute, as amended in 2019, shifts the burden of proof on the affirmative defense of self-defense from the defendant to the prosecution, provided that "there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence." R.C. 2901.05(B)(1)*; See State v. Tolle,* 2020-Ohio-935, ¶ 18 (4th Dist.).

**{¶49}** " 'In determining whether to give a requested jury instruction, a trial court may inquire into the sufficiency of the evidence to support the requested instruction.' " *Tolle* at ¶ 20, quoting *State v. Hamilton*, 2011–Ohio–2783, ¶ 70 (4th Dist.). A trial court is therefore vested with discretion "to determine whether the evidence is sufficient to require a jury instruction." *State v. Mitts,* 81 Ohio St.3d 223, 228 (1998); *see also State v. Wolons*, 44 Ohio St.3d 64 (1989), paragraph two of the syllabus. "When determining whether evidence is sufficient, a trial court must consider only the adequacy of the evidence presented—not its persuasiveness * * *. The question is not whether the evidence should be believed but whether the evidence, *if believed*, could convince a trier of fact, beyond a reasonable doubt, that the defendant was acting in self-defense." (Citations omitted.) *State v. Palmer*, 2024-Ohio-539, ¶ 21. "Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of self-defense." *State v. Melchior,* 56 Ohio St.2d 15, 20 (1978). "If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *Id.* Thus, "[a]s a matter of law the trial court cannot give a jury instruction on an affirmative defense if a defendant fails to meet this burden." *State v. Schwendeman*, 2018-Ohio-240, ¶ 19 (4th Dist.)

**{¶50}** " 'To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *Tolle* at ¶ 25, quoting *State v. Barnes,* 94 Ohio St.3d 21, 24 (2002), citing *State v.*

*Robbins,* 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. "Furthermore, the degree of force used by a defendant must be 'warranted under the circumstances' and 'proportionate to the perceived threat.' " *State v. Bundy*, 2012-Ohio-3934, ¶ 55 (4th Dist.), quoting *State v. Palmer,* 80 Ohio St.3d 543, 564 (1997). *See State v. Paskins*, 2022-Ohio-4024, ¶ 50 (5th Dist.).

**{¶51}** " 'Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. However, "one who intervenes to help a stranger stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault." * * * Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense.' " *State v. Dixon*, 2022-Ohio-2807, ¶ 35 (4th Dist.), quoting *State v. Belcher,* 2013-Ohio-1234, ¶ 35 (2d Dist.), quoting *State v. Moss*, 2006-Ohio-1647, ¶ 13 (10th Dist.); *State v. Wenger*, 58 Ohio St.2d 336, 340 (1979). For Jay Farmer to act in defense of Larry, the evidence must show: (1) that Larry was not at fault in creating the violent situation that gave rise to the affray, (2) that Larry had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, and (3) that Larry did not violate any duty to retreat or avoid the danger. *See State v. Blevins,* 2019-Ohio-2744, ¶ 75 (4th Dist.).

**{¶52}** Based on our de novo review of the witnesses' testimony, along with our review of the video of the incident, we find insufficient evidence to warrant a defense of another jury instruction. Thus, we do not find the trial court abused its discretion when it declined the request to give a defense of another instruction. Farmer is entitled to a

defense of another jury instruction if he presents legally sufficient evidence for every element of that claim. *State v. Palmer*, 2024-Ohio-539, ¶ 19. A trial court is vested with discretion to determine whether the evidence is sufficient to require a jury instruction. Farmer has failed to establish sufficient qualitative evidence that Larry was not at fault in creating the situation giving rise to the affray, that either of them had a bona fide belief that Larry was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, or that the duty to retreat or avoid the danger was not violated by them. *See State v. Underwood*, 2024-Ohio-2273, ¶ 36-44 (4th Dist.). The evidence, if believed, could not convince a trier of fact, beyond a reasonable doubt, that Farmer was acting in defense of another. *State v. Wilson*, 2024-Ohio-776, ¶25.

{¶53}  First, the evidence that Farmer and his father were not at fault in creating the situation giving rise to the affray is inadequate. Farmer and his father went, armed and uninvited, to a trailer where they expected to find Kisor. Goheen testified that Larry came to the door and announced, "I'm taking the keys of my truck with me or I'm going to kick his ass." Jay Farmer did not refute this testimony and instead testified that he did not recall what his father said. After Kisor went out to meet them, a heated argument quickly ensued and Jay Farmer immediately trained a firearm on Kisor as he walked away from Larry. The video shows Kisor in a continuous state of retreat and Larry continuously advancing towards him during the argument, all the while Jay Farmer had a firearm trained on Kisor. It was two of them against Kisor. Jay Farmer exited the truck after Kisor walked past, allowing Jay to continue to have his gun aimed directly at Kisor.  The video showed that Larry advanced closer to Kisor and raised his arms towards Kisor immediately before Kisor hit him with the bat. Then immediately Kisor retreated four to

five steps backwards. Kisor began his retreat immediately following the hit, before Jay Farmer stepped forward and fired shots towards Kisor. After Larry was hit with the bat, he rubbed his neck a few times and started advancing towards Kisor again. Although both Jay Farmer and Larry could have retreated to their truck and drove away, they continued their armed pursuit of Kisor. Jay Farmer admitted that, after the initial four shots, he fired a second time at Kisor, after his father chased Kisor from behind the truck and out into the yard.

{¶54} The evidence shows that the Farmers were at fault for creating the situation that led to the affray. Jay Farmer argues that there was evidence that they were not at fault because Kisor had a gun too and was pointing it at them. First, there is no video evidence that Kisor had a gun. Second, even if Kisor had a BB gun, the undisputed testimony was that when the Farmers arrived to speak to him they both were already brandishing handguns and any gun Kisor may have had was in response to the Farmers being armed. Third, Jay Farmer testified that Kisor had a gun and pointed it at them at the very beginning of the incident, but Jay did not know what happened to Kisor's gun, he did not see it again, Kisor never fired it, and Kisor did not have it in his hands, brandish it, or point it at them after that initial instance. There is also no video evidence of Kisor making the motion of pulling out a gun or putting one away during the entire videoed altercation. Jay Farmer was the only one with a handgun out, aimed, and ready to fire throughout the entire situation, and he was joined by his father, who later retrieved his gun and fired a shot at Kisor, too.

{¶55} Second, Jay Farmer presented no evidence that a reasonable person, under the same circumstances and with the same subjective beliefs and faculties, would

have a bona fide belief that Larry was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. *Palmer* at ¶ 25. After Kisor hit Larry with the bat, Kisor immediately and quickly retreated from him – before Jay fired any shots. Kisor only struck once and immediately retreated; Kisor was not hitting Larry repeatedly. Larry did not testify about his beliefs and faculties, but the video evidence shows him rubbing his neck a few times and then immediately re-engaging in his pursuit of Kisor. The single hit did not appear to disturb or rattle Larry. Thus, there was no evidence that Jay Farmer had a reasonable belief his father was in imminent danger of death or great bodily harm whose only means of escaping it was use of deadly force. Thus, viewing the evidence presented in a light most favorable to the defendant, there was no need for Jay Farmer to step forward and fire four shots towards Kisor. After Larry was struck once with the bat, both Farmer men could have entered their truck and drove away to escape whatever imminent danger they perceived. In fact, Farmer admitted throughout his testimony that he and his father could have left at any time. Instead, they continued their armed pursuit of Kisor.

{¶56} Third, the Farmers violated their duty to retreat. Farmer argues that he had no duty to retreat because they were in a place they lawfully had a right to be. He argues that Goheen was the only individual with a right to the property and he never told them to leave. However, the Farmers' status, at best, was one of a licensee because, taken in a light most favorable to defendant, the evidence was that Goheen gave permission for them to be on his property if Larry put his handgun away. *Durfor v. W. Mansfield Conservation Club,* 2022-Ohio-416, ¶ 18 (3d Dist.) ("A licensee is one who enters the premises of another by permission or acquiescence, for his own pleasure or benefit, and

not by invitation."). However, the Farmers almost immediately brandished firearms in violation of Goheen's instructions, and their behavior was so distressing that after witnessing a few moments of the armed confrontation, Goheen testified that he fled his property. He felt safe to return only after he saw the Farmers' truck leave. He returned to see if he could find Kisor, determine if he was shot, and whether he needed assistance. We do not believe that Goheen had to endanger himself and interrupt the armed altercation to tell the Farmers to leave. When a licensee exceeds the scope of the landowner's permission, the licensee loses their status as a licensee and becomes a trespasser. *See Williams v. Cook*, 132 Ohio App.3d 444, 449 (3d Dist.1999) (an invitee who exceeds the scope of the landowner's invitation becomes a trespasser). The Farmers lost whatever legal right they may have had to be on Goheen's property when they violated his instructions to put away their handguns and engaged in violent antics that caused him to flee his own property.

{¶57} Viewing the evidence presented in the light most favorable to Farmer, we conclude that Farmer failed to present legally sufficient evidence to show that (1) the Farmers were not at fault for creating the situation that led to the affray; (2) under the same circumstances a reasonable person could have subjectively believed that his father was in imminent danger of death or great bodily harm and his only way of escape was the use of deadly force; and (3) the Farmers did not have a duty to retreat. We overrule Farmer's first assignment of error.

### B.  Ineffective Assistance of Counsel

{¶58} Farmer contends that his trial counsel was ineffective for failing to argue that firing warning shots was not inconsistent with the defense of another and for

indicating that he would elect an instruction on the inferior degree offense over defense of another. He claims he was prejudiced by counsel's failures because otherwise he would have received a defense of another jury instruction, and the trial outcome would have been different.

### 1. Standard of Review

**{¶59}** To prevail on an ineffective assistance claim, a defendant must show: "(1) that his counsel's performance fell below an objective standard of reasonableness and (2) that his counsel's deficient performance prejudiced him resulting in a fundamentally unfair or unreliable outcome of the proceeding." *State v. Wilson,* 2024-Ohio-776, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *State v. Bailey*, 2023-Ohio-2919, ¶ 10 (4th Dist.).

### 2. Legal Analysis

**{¶60}** Farmer contends that his trial counsel was ineffective for failing to make more persuasive arguments in support of, and for appearing to abandon, a jury instruction on defense of another. However, even if we assume for the sake of argument that his trial counsel's representation was deficient, Farmer cannot show prejudice. His claim of

prejudice rests on his assertion that he was entitled to a defense of another jury instruction and that the trial court would have given the instruction with more persuasive arguments. We have already determined that the evidence at trial did not warrant an instruction on defense of another. Based upon our disposition of the first assignment of error, more persuasive arguments for an instruction would have been meritless. *State v. Schwendeman*, 2018-Ohio-240, ¶ 22 (4th Dist.); *State v. Ferrell*, 2020-Ohio-6879, ¶ 49 (10th Dist.) (trial counsel is not deficient for failing to request jury instruction that the appellate court determined was not warranted by the evidence). Because Farmer's trial counsel cannot be deficient for failing to argue more persuasively for an unwarranted jury instruction, we overrule the second assignment of error.

## C. Sentencing

{¶61} For his next three assignments of error, Farmer raises contentions with various aspects of his sentencing: (1) the trial court did not make the required findings under R.C. 2929.14(C)(4) before imposing consecutive sentences; (2) the trial court failed to merge allied offenses of similar import when it did not merge attempted murder and improper discharge of firearm into a habitation; and (3) on the two offenses the trial court did merge (felonious assault merged with attempted murder), it improperly sentenced Farmer on the merged felonious assault offense. The State concedes that the trial court did not fully comply with R.C. 2929.14(C)(4) before imposing consecutive sentences and that trial court improperly sentenced Farmer on the merged felonious assault offense. However, the State opposed Farmer's argument that his attempted murder and improper discharge into a habitation should merge because there was a separation in time between

the two firing episodes and there were two victims and two separate harms (Goheen and Kisor).

**{¶62}** Based on our review of the sentencing transcript and entry, we find that the trial court erred in imposing consecutive sentencing without making the statutory findings. For the reasons set out below, we affirm Farmer's third assignment of error and remand the matter for re-sentencing. Because we remand for a new sentencing hearing, Farmer's fourth and fifth assignments of error, in which he argues the trial court erred in failing to merge his remaining offense and erroneously sentenced him on a merged offense, are moot.

### 1. Imposition of Consecutive Sentences

**{¶63}** For his third assignment of error, Farmer contends that the trial court did not make the necessary findings under R.C. 2929.14(C)(4) before imposing consecutive sentences. Under R.C. 2953.08(A)(4) "a defendant who is convicted of or pleads guilty to a felony may appeal as a matter of right the sentence imposed upon the defendant" on the ground that "[t]he sentence is contrary to law." "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under [R.C. 2953.08] or may vacate the sentence and remand the matter to the sentencing court for resentencing" "if it clearly and convincingly finds" that the record does not support certain findings by the sentencing court, including consecutive sentence findings under R.C. 2929.14(C)(4), or "[t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2).

**{¶64}** R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender

and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶65}** "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry . . . ." *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. "Though 'a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, . . . it has no obligation to state reasons to support its findings. Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry.' " *State v. Jones,* 2024-Ohio-1083, ¶ 11, quoting *Bonnell* at ¶ 37. "R.C. 2953.08(F) requires an appellate court to review the entire trial-court record, including any oral or written statements made to or by the trial court at the sentencing hearing, and any presentence, psychiatric, or other investigative report that was submitted to the court in writing before the sentence was imposed." *Jones* at ¶ 12, citing R.C. 2953.08(F)(1) through (4). "If the trial court fails to make the requisite findings at the sentencing hearing, the imposition of

consecutive sentences is contrary to law even if the sentencing entry includes the findings." *State v. Conn*, 2023-Ohio-2669, ¶ 26 (4th Dist.); *State v. Nolan*, 2024-Ohio-1245, ¶ 18 (4th Dist.).

**{¶66}** The trial court's sentencing findings as they related to consecutive sentences were, "counts one and three would be served consecutively, necessary to protect the public. The harm is so unusual or great that a single term does not adequately punish." There was no finding about the proportionality of the sentence to the defendant's conduct.

**{¶67}** The sentencing entry contains the following findings concerning consecutive sentences, which address the first two factors in R.C. 2929.14(C)(4) but does not address any of the factors in subsections (a), (b), or (c):

> In fashioning the sentence(s) in this case, the Court has considered the need to protect the public from future crime by the defendant and others, to punish the defendant, and to promote the defendant's effective rehabilitation while using the minimum sanctions to accomplish those purposes without imposing an unnecessary burden on state or local government resources. This includes the need for incapacitation, deterrence, rehabilitation of the defendant, and restitution to the victim and/or the public. This sentence is commensurate with, and not demeaning to, the seriousness of the defendant's conduct and its impact on the victim, consistent with sentences for similar crimes by similar offenders, and is no way based on the defendant's race, ethnicity, gender, or religion.

**{¶68}** The trial court's oral pronouncements and sentencing entry do not satisfy the R.C. 2929.14(C)(4) requirements. There was nothing in the court's remarks that discussed the proportionality of the sentence to either the seriousness of Farmer's conduct or the danger he poses to the public. There was also no discussion of Farmer's criminal history or the great and unusual harm caused by the offenses from which we can

discern that the court made findings under R.C. 2929.14(C)(4)(a) - (c). Additionally, the sentencing entry fails to address findings under R.C. 2929.14(C)(4)(a)-(c).

**{¶69}** The trial court erred when it imposed consecutive sentences here. Because the trial court failed to make all the requisite findings under R.C. 2929.14(C)(4) at the sentencing hearing and in the entry, we clearly and convincingly find that the order of consecutive sentences is contrary to law. *Conn* at ¶ 29. Accordingly, we sustain the third assignment of error, vacate Farmer's sentence and remand the case for the limited purpose of resentencing him. *Id.* However, "[w]e hasten to add . . . that our decision should not be construed as a comment on the propriety of consecutive sentences. On remand, the trial court may choose to impose any sentence it deems appropriate under the pertinent statutory provisions." *State v. Brickles*, 2021-Ohio-178, ¶ 11 (4th Dist.).

**{¶70}** Because we sustain Farmer's third assignment of error and remand for a new sentencing hearing, we need not address his remaining argument raised in his fourth and fifth assignments of error that challenge other aspects of his sentence. App.R. 12(A)(1)(c).

### D.  Manifest Weight of the Evidence

**{¶79}** For his sixth assignment of error, Farmer contends that all three of his convictions were against the manifest weight of the evidence because Kisor was an unreliable witness who lacked credibility, the video recording of Farmer's actions was unreliable, the sheriff's office failed to connect Farmer to the evidence, and Farmer testified that he "didn't want to hurt" Kisor so the jury should have believed him and found that he lacked the mens rea to support a conviction of attempted murder.

### 1.  Standard of Review

**{¶80}** In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, syllabus; *State v. Harvey*, 2022-Ohio-2319, ¶ 24 (4th Dist.). Because a trier of fact sees and hears the witnesses, appellate courts will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.).

2. Elements of the Offenses

**{¶81}** A jury verdict is not against the manifest weight of the evidence if the State introduces substantial evidence on each element of an office so that the jury can find guilt beyond a reasonable doubt. The elements of the offenses of attempted murder, felonious assault, and improper discharge of a firearm at or into a habitation are as follows:

> Attempted Murder - No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense. R.C. 2923.02(A) (Attempt). No person shall purposely cause the death of another. R.C. 2903.02(A) (Murder).
>
> Felonious Assault – No person shall knowingly . . . cause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance. R.C. 2903.11(A)(2).
>
> Improperly Discharging a Firearm at or into a Habitation – No person, without privileged to do so, shall knowingly . . . discharge a firearm at or into

an occupied structure that is a permanent or temporary habitation of any individual. R.C. 2923.161(A)(1).

### 3. Evidence of the Elements

{¶82} Farmer testified that he was armed with a .38 caliber handgun and that he purposely fired five shots during the incident. He testified that he fired one of those shots at Kisor and the other four down the street that ran adjacent to where Kisor was standing at the time, but that all the shots he fired were "warning shots." Farmer testified that the shot his father fired at Kisor, which appeared in the video to be virtually point blank at Kisor, was also a "warning shot." Farmer also testified that the video recording was accurate and that he was angry with Kisor for allegedly stealing his truck, causing the police to interview his wife, and causing his property to be the subject of a search warrant. The video evidence shows that Farmer appeared to fire all five shots at Kisor. Evidence that bullets were found in the truck cab hood, which was in front of where Kisor was standing, and the trailer, which was behind the area Kisor was standing, support Kisor's version of events, which was that both Jay and Larry were firing at him, and what appears in the video.

{¶83} Farmer argues that Kisor's testimony is not credible because it conflicts with Goheen's testimony concerning whether Kisor had a BB gun on him when he went outside. Farmer also contends that Kisor lacked credibility because of his criminal history. And, despite testifying that the video was accurate, Farmer contends that it was unreliable because it did not fully record the entire incident and because Kisor was the custodian of the video before it was turned over to law enforcement. He argues that the sheriff's office did not conduct a thorough investigation because it did not send the bullets out for testing and there was no identification of the caliber associated with the bullets, Finally, he argues

that the jury should have believed his testimony that he did not intend to harm Kisor and found he lacked the mens rea to support the attempted murder conviction.

{¶84} First, we reject Farmer's argument that the jury should have disbelieved Kisor's version of events and believed his version instead. It is the role of the jury to determine the weight and credibility of evidence. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 2016-Ohio-3338, ¶ 17 (4th Dist.), quoting *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.). We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *State v. Webb*, 2023-Ohio-4050, ¶ 44 (4th Dist.). Although Goheen testified that Kisor had a BB gun and Kisor testified that he did not, the jury heard both witnesses and watched the video, which contained no evidence that Kisor was carrying or pointing a gun. The enlargement photographs of certain portions of the video likewise contained no evidence that Kisor was carrying a gun; they were blurry pixilated images impossible to conclusively interpret. Farmer claims it was evidence Kisor was pointing a gun and Kisor claims it was evidence he was gesturing a middle finger. The jury was free to determine which version was more credible.

{¶85} Although Farmer argues that the video was unreliable because it did not capture the entire incident and was in Kisor's possession before law enforcement obtained it, he nevertheless testified that what it did capture was accurate. The video provided evidence for each of the elements of the crimes. Farmer fails to explain how his criticisms of the video negatively impaired the evidentiary value of the existing video

footage. The jury was aware that there was a segment of time the video did not record and it knew how the video was obtained and processed by law enforcement. They also heard Farmer testify that the video was accurate. The jury was free to consider all of this when it viewed and weighed the import of the video evidence.

{¶86} Similarly, Farmer fails to connect his contentions that the sheriff's investigation was incomplete and lacked credibility with the elements of any of the offenses. He contends that the sheriff's office did not test the bullets, but law enforcement testified that they were not sent out to be tested because neither of the Farmers' handguns were ever recovered. Their handguns were inexplicably lost immediately after the incident occurred. Therefore, law enforcement did not test the bullets to see what sort of gun fired them. Additionally, Farmer testified he shot five bullets and law enforcement testified that they recovered five .38 caliber casings at the scene. The video showed Farmer firing his firearm repeatedly, for a total of five shots. If law enforcement had recovered none of the bullets, the State would still have presented sufficient evidence of all elements of the offenses.

{¶87} We reject Farmer's contention that his convictions for attempted murder, felonious assault, and improperly discharging a firearm into a habitation were against the manifest weight of the evidence. After our review of the record, and after we consider the evidence and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence or lack thereof, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice such that the convictions must be reversed and a new trial ordered. Instead, we believe that the State adduced substantial evidence at

trial to prove all the elements of all three offenses beyond a reasonable doubt. Accordingly, we overrule the sixth assignment of error.

## IV.  CONCLUSION

{¶88} For the foregoing reasons, we overrule the first, second, and sixth assignments of error and sustain the third assignment of error. Because we vacate Farmer's sentence and remand for a new sentencing hearing, the fourth and fifth assignments of error are moot. We affirm the trial court's judgment in part, vacate it in part, and remand for further proceedings consistent with this decision.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART.

CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART, VACATED IN PART AND REMANDED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Jackson County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge


### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**