[Cite as *State v. Willey*, 2026-Ohio-242.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 25CA1 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Matthew D. Willey, | : | **RELEASED 1/23/2026** |
| Defendant-Appellant. | : | |

_____

<u>APPEARANCES</u>:

Renee Severyn, Assistant Public Defender, and Elise Grifka Wander, Assistant Public Defender, Columbus, Ohio, for appellant.

Alisa Turner, Ross County Assistant Prosecuting Attorney, and Jeffrey C. Marks, Ross County Prosecuting Attorney, Chillicothe, Ohio, for appellee.

_____

Hess, J.

{¶1}     Matthew D. Willey appeals the judgment of the Ross County Court of Common Pleas convicting him of involuntary manslaughter, a first-degree felony, following a jury trial. Willey contends that his conviction lacked sufficient evidence and was against the manifest weight of the evidence because the State failed to show that his conduct was the proximate cause of the victim's death. He also contends the conviction was against the manifest weight of the evidence because the State failed to prove he was not acting in the defense of another. Finally, Willey contends that the trial court committed plain error when it gave jury instructions that inaccurately explained the standards for non-

deadly and deadly force and improperly implied that the individual Willey was defending had a duty to retreat.

**{¶2}** We find that the State proved that Willey did not act in defense of another because the person he was defending was at fault in creating the situation that gave rise to the affray and Willey used force that far exceeded the level of force needed to defend another and became the aggressor. We find that Willey invited any error in the jury instructions as it relates to nondeadly and deadly force used in defense of another and that he failed to show plain error as it relates to any error in the jury instruction concerning the duty to retreat. Finally, we find that there was sufficient evidence to support his involuntary manslaughter conviction and that it was not against the manifest weight of the evidence. We affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

**{¶3}** In December 2023, a Ross County grand jury indicted Willey of one count of involuntary manslaughter in violation of R.C. 2903.04, a first-degree felony. Willey pleaded not guilty and the matter proceeded to trial.

**{¶4}** At the trial, a corrections officer at the Chillicothe Correctional Institution (CCI) testified that at approximately 8:10 p.m. on April 29, 2021, he was conducting a security round in one of the inmate housing units and discovered the victim, Michael Keeton, Sr., unresponsive in his bunk. The officer radioed for Keeton to be transported to the medical infirmary. The officer testified that he had witnessed Keeton earlier in the restroom coughing up blood.

**{¶5}** A registered nurse at CCI testified that she observed Keeton twice that day, both times in his bunk area. The first time she saw Keeton, he told her he had fallen in

the restroom, hit his head, and felt dizzy. Keeton declined any medical treatment. The second time she saw Keeton was in response to the officer's call that Keeton was unresponsive in his bunk. She saw Keeton initially in his bunk, but then Keeton was transported to the infirmary and the nurse assessed his condition in the infirmary. The nurse reviewed photographs of Keeton and confirmed that the photos were taken when she saw him the second time after he was transported to the infirmary. The photographs showed bruising and a bloody nose, abrasions around his eyes, bruising and swollen areas on his knuckle, bruising on his shoulder and back, a boot mark on his lower back left side, and scratching and abrasions around his neck, chest, and clavicle. The nurse determined Keeton should be transported out for further medical care because the infirmary did not have the facilities to do further testing or treatment.

{¶6} Another corrections officer testified that he accompanied Keeton as they transported him to the Adena Regional Medical Center in Chillicothe and on the subsequent life-flight to the OSU Medical Center. Keeton's condition quickly deteriorated to the point of death. The corrections officer accompanied Keeton's body to the morgue, where the body was picked up by the Franklin County Coroner's Office.

{¶7} A third corrections officer, Lieutenant Zachary Ward, testified that he witnessed the injuries to Keeton and commenced an investigation. Lt. Ward testified that he interviewed Keeton, who told him that he had fallen, however, the injuries were not consistent with a fall. Lt. Ward reviewed security camera footage of the relevant housing unit and interviewed other inmates. Lt. Ward located video of Keeton coming out of the restroom holding his face area, and two other inmates coming out of the restroom several minutes later behind Keeton. Lt. Ward put the restroom in lockdown mode and

interviewed the two inmates, taking photographs of their bodies to show any physical injuries consistent with a physical altercation. Willey was one of the two inmates photographed. Lt. Ward also photographed the restroom area and testified about the contents of the photos at trial. One of the photos depicted an inmate's jacket, pants, and shirt that was discovered in the restroom trashcan.

**{¶8}** Correctional Officer Lieutenant Glenn Bryan testified that he was also working the evening of April 29 and the morning of April 30, 2021. Lt. Bryan testified that he was informed that Keeton had been transported for medical treatment due to a ruptured spleen. Lt. Bryan became involved in the investigation because Keeton had injuries that appeared as though he had been kicked, assaulted, or otherwise suffered an altercation. Lt. Bryan and Lt. Ward reviewed the security camera video for approximately seven to eight hours and identified Willey and another inmate, Charles Robbins, going into the restroom with Keeton at approximately 3:39 p.m. on April 29. Lt. Bryan reviewed the video tape for the jury and testified that the footage was from a camera above the south restroom entrance and accurately shows persons entering and exiting the restroom. LT. Bryan testified that approximately 27 inmates entered the restroom, including Willey and the second inmate, Charles Robbins. Lt. Bryan interviewed five additional inmates as part of the investigation.

**{¶9}** Inmate Charles Robbins testified that he had been an inmate at CCI for approximately a month and was associated with the Aryan Brotherhood group. Robbins had two conversations with Keeton leading up to April 29, 2021 in which Robbins told Keeton that Keeton had tattoos that had to be covered up. Robbins gave Keeton a week to do this, and then, when Keeton had not complied, he gave Keeton an additional day to

have it covered up so that Keeton was to have the tattoos covered by April 29, 2021. Robbins testified that two of the conversations about the tattoos took place at Keeton's bunk area and the last one took place in the restroom. Robbins went into the restroom and Willey went to get Keeton and then Willey and Keeton followed Robbins into the restroom.

{¶10} Robbins testified that he had not yet decided what Keeton's punishment would be for failing to cover the tattoos, but when he told Keeton to show Robbins his wrist, Keeton took a swing at Robbins and missed, and then Robbins took a swing at Keeton and missed. Robbins testified that after the two swings and misses, Keeton put Robbins in chokehold. After Keeton placed Robbins in a chokehold, Willey shouted at Keeton and placed Keeton in a chokehold. Robbins could feel Keeton's body jar and move as though Willey was punching Keeton from behind. Robbins was able to free himself from Keeton's chokehold and see Willey punching Keeton multiple times in the face. Keeton then fell back and was about to collapse when Willey punched Keeton again in the neck and face area. Robbins testified that Keeton's head swung back, hit the stall door, and Keeton "collapsed on the floor in a heap of blood. . . started to convulse" and lost consciousness. Robbins testified, "He convulsed. He fell into a heap on the floor. Blood, and I tried to push Matt [Willey] off at least two to three times and tell him like he's had enough because I seen the blood, and the fact that Keeton was starting to convulse, I freaked out." Robbins testified, "Matt was about to stomp him with his boot and I told him don't - - don't do it. I mean he's done. He's had enough. And I pushed Matt back and we both left the bathroom." Robbins testified that after he left the restroom, he went back in

and saw that Keeton had "came to" and Keeton had removed his shirt and was trying to mop up his blood with it, but Robbins did not have any further words with Keeton.

{¶11} Robbins testified that he pleaded guilty to involuntary manslaughter for his involvement in the altercation with Keeton and, in exchange, Robbins was sentenced to a four-year prison term and agreed to testify in accordance with a statement Robbins had previously given law enforcement about the incident.

{¶12} On cross examination, Robbins testified that he was never in the restroom with Keeton without Willey also being in the restroom with them. Robbins also testified that when he tried to hit Keeton, he was "pretty sure I missed that first punch" and that he "tried to stop Matt" from kicking Keeton while Keeton was collapsed on the floor, so Robbins was not aware whether Keeton had suffered any kicks to his body.

{¶13} Justin Rowe, an inmate at CCI, testified that he was housed in the same housing unit with Keeton, Willey, and Robbins. Another inmate, Bobby Laywell, had approached Rowe and told him that there was going to be a fight in the restroom and Laywell asked Rowe to pack up Laywell's, Robbins', and Willey's stuff so that it would not be stolen by other inmates. Rowe explained that when inmates get into fights, they are "put into the hole" and Willey "got rode out to Lucasville" and other inmates try to steal their belongings. Rowe identified a letter that Willey wrote to Rowe while Willey was housed at Lucasville. Rowe read the letter and identified that it was a true and accurate copy of the letter he received from Willey. In the letter, Willey wrote, "They didn't put me as a level 5-B cause we didn't mean to kill him. At least they got that part right in my ticket." On cross examination, Rowe testified that he was "pretty high, man" and not "in

my right state of mind" when he eventually gave a statement to law enforcement concerning the incident and he did not remember whether he lied to law enforcement.

{¶14} Investigator Aaron Lindsey testified that he reviewed the video from the security cameras and, at approximately 3:35 p.m., identified Willey leave Robbins' bunk area and go to Keeton's bunk area. Another angle shows Robbins entering the restroom and Willey and Keeton entering the restroom shortly thereafter, at approximately 3:36 p.m. The video footage also shows inmate Laywell enter inmate Rowe's bunk area and the two engage in a discussion. The footage shows Robbins exit the restroom carrying a pair of dark colored gloves in his hand. Approximately four seconds after Robbins exits the restroom, Willey exits the restroom. Willey was wearing a dark shirt under the blue uniform shirt and blue pants and a pair of boots. Later, Willey returns to the restroom having changed into dark shorts and a pair of slide sandals. Willey appears to be carrying in his hand the blue uniform shirt he was wearing. Willey enters the restroom again and then exits about 20 seconds later with Laywell. An inmate with a mop and bucket exits the restroom and then Robbins enters the restroom again and then approximately 11 minutes later exits the restroom. At approximately 3:59 p.m., approximately 23 minutes after he initially entered at 3:36 p.m. with Willey, Keeton exits the restroom covering his nose and facial area with his hand and returns to his bunk. Investigator Lindsey was never able to recover the boots that Willey was initially wearing when he entered the restroom with Keeton. Investigator Lindsey testified that the boots were not part of the state issued clothing but were available for inmates to purchase. He was not aware that any other inmates were wearing boots that day.

{¶15} Ohio State Highway Patrol Trooper Marlin Folder testified that he investigates crimes on prison property and reviewed the video footage from the incident. The footage showed Willey tap Keeton on the shoulder and summon him to the restroom after Robbins had already gone into the restroom. There are no security cameras located inside the restroom out of privacy concerns. The footage showed other inmates congregating outside the restroom and walking by to see what was going on inside. Inmate Laywell appeared to be serving as a lookout for prison staff and correction officers. In Trooper Folder's experience, violent assaults often occur in areas like restrooms where there are no security cameras and inmates often congregate around the restroom areas when a violent offense is about to happen because they "live a fairly boring existence . . . so when a fight kicks off, it's inhouse entertainment for these guys. They all tend to congregate around and look to see what's going on."

{¶16} A forensic pathologist and deputy coroner with the Franklin County Coroner's Office testified that she performed the autopsy on Keeton and explained the steps involved in performing an autopsy. Keeton suffered bruising on the left side of his body where his kidney and spleen are located. He had a large quantity of blood pooling in the body cavity which indicates that there was trauma. She located a contusion and hemorrhaging of the spleen. The spleen had been torn and internally ruptured. There were two points of trauma on the lower left and upper left side and there was hemorrhage associated with that and there was trauma to the upper back shoulder and mid-back areas. The traumas associated with Keeton's death were the ones that were in direct proximity to the spleen, which caused the rupture and lacerations on the spleen and subsequent bleeding. Keeton's cause of death within a reasonable degree of medical

certainty was exsanguination, or loss of blood, due to blunt force trauma to the torso. The manner of death could not be determined because there were conflicting reports as to whether Keeton had fallen or whether he was assaulted. As a result, without further information at that time, the manner of death could be accident or homicide. If Keeton had only fallen, it could be an accident, but if Keeton were assaulted, it could be homicide. A fall from being knocked unconscious could also have been sufficient to have caused the fatal lacerations to the spleen.

**{¶17}** The jury found Willey guilty of involuntary manslaughter. Willey filed motions for an acquittal under Crim.R. 29 and a new trial under Crim.R. 33, which the State opposed, and the trial court denied. The trial court sentenced him to a minimum 8-year prison term, with a maximum indefinite 12-year prison term and ordered restitution in the sum of $12,417.23 to the victim's relative.

## II.  ASSIGNMENTS OF ERROR

**{¶18}** Willey presents the following four assignments of error:

I.      Willey's conviction of involuntary manslaughter was against the manifest weight of the evidence because the State did not prove Willey was not acting in defense of another. This error denied him his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution. Tr. 260; Judgment Entry, Nov. 1, 2024; Denial of Defendant's R.29 and R.33 Motions, Jan. 13, 2025.

II.     The trial court erred in providing inaccurate instructions on the standards for non-deadly and deadly force and improperly implying that Robbins had a duty to retreat, denying Willey his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution. Tr. 249-250.

III.     Willey's conviction of involuntary manslaughter lacks sufficient evidence because the State did not prove that Willey's conduct was the proximate cause of the victim's death. This error denied him his right to due process under the Fifth and Fourteenth Amendments to the United States

Constitution and Section 16, Article I of the Ohio Constitution. Judgment Entry, Nov. 1, 2024; Denial of Defendant's R.29 and R.33 Motions, Jan. 13, 2025.

IV.    Willey's conviction of involuntary manslaughter was against the manifest weight of the evidence because the State did not prove that Willey's conduct was the proximate cause of Keeton's death. This error denied him his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution. Tr. 260; Judgment Entry, Nov. 1, 2024; Denial of Defendant's R.29 and R.33 Motions, Jan. 13, 2025.

### III.  LEGAL ANALYSIS

### A. Defense of Another

**{¶19}** Willey contends that his involuntary manslaughter conviction is against the manifest weight of the evidence because the State failed to prove beyond a reasonable doubt that he did not act in defense of another. Willey argues that when he acted against Keeton, Keeton was choking Robbins almost to the point of unconsciousness. He contends that the State had the burden to prove he was not acting in defense of Robbins when he attacked Keeton, beating him until he collapsed bloodied and unconscious on the restroom floor.

**{¶20}** The State contends that it disproved that Robbins was not at fault in creating the situation giving rise to the affray. The evidence showed that this was a preplanned, coordinated attack in an area with no security cameras by two inmates against one -- Willey and Robbins against Keeton. Robbins created the situation giving rise to the affray and therefore, Willey was not acting in defense of Robbins because Robbins could not be acting in defense of himself under such circumstances.

## 1. Standard of Review

{¶21} In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56 (1988), syllabus; *State v. Harvey*, 2022-Ohio-2319, ¶ 24 (4th Dist.). However, to prove the absence of self-defense, the State need only present substantial evidence to disprove any one of the elements of self-defense. *State v. Messenger,* 2021-Ohio-2044, ¶ 50 (10th Dist.). Because a trier of fact sees and hears the witnesses, appellate courts will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.); *State v. Colonel*, 2023-Ohio-3945, ¶ 50-54 (4th Dist.).

## 2. Elements of Self-Defense & Defense of Another

{¶22} A claim of self-defense includes the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Messenger*, 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

Since H.B. 228 amended R.C. 2901.05, effective March 28, 2019, the burden regarding

self-defense set forth in R.C. 2901.05(B)(1) is:

> A person is allowed to act in self-defense, defense of another, or defense
> of that person's residence. If, at the trial of a person who is accused of an
> offense that involved the person's use of force against another, there is
> evidence presented that tends to support that the accused person used the
> force in self-defense, defense of another, or defense of that person's
> residence, the prosecution must prove beyond a reasonable doubt that the
> accused person did not use the force in self-defense, defense of another,
> or defense of that person's residence, as the case may be.

{¶23} " 'Defense of another is a variation of self-defense. Under certain

circumstances, one may employ appropriate force to defend another individual against

an assault. However, "one who intervenes to help a stranger stands in the shoes of the

person whom he is aiding, and if the person aided is the one at fault, then the intervenor

is not justified in his use of force and is guilty of an assault." * * * Therefore, one who

claims the lawful right to act in defense of another must meet the criteria for the

affirmative defense of self-defense.' " *State v. Dixon*, 2022-Ohio-2807, ¶ 35 (4th Dist.),

quoting *State v. Belcher,* 2013-Ohio-1234, ¶ 35 (2d Dist.), quoting *State v. Moss*, 2006-

Ohio-1647, ¶ 13 (10th Dist.); *State v. Farmer*, 2024-Ohio-6063, ¶ 52 (4th Dist.). For

Willey to act in defense of Robbins, the evidence must show: (1) that Robbins was not at

fault in creating the situation that gave rise to the affray, (2) that Robbins had a bona fide

belief that he was in imminent danger of death or great bodily harm and that his only

means of escape was the use of force, and (3) that Robbins did not violate any duty to

retreat or avoid the danger.

> In addition, "a person cannot continue to use force against the original
> aggressor once the imminent danger of death or serious bodily injury
> dissipates; the defender cannot become the aggressor." That is, " 'the
> defense of self-defense does not permit the alleged victim to become the

aggressor once the affray has ended, or before an affray has even taken place.' " (Citations omitted).

*State v. Bierma,* 2024-Ohio-2089, ¶ 71 (2d Dist.).

**{¶24}** Willey argues that his conviction is against the manifest weight of the evidence because Robbins testified that after Robbins and Willey corralled Keeton in the restroom, Keeton threw the first punch and then managed to get Robbins in a chokehold, while Willey stood passively by and pleaded with Keeton to stop.

**{¶25}** The State is only required to disprove one of the elements of Robbins' self-defense beyond a reasonable doubt to sufficiently disprove Willey's claim of defense of Robbins. A conviction is not against the manifest weight of the evidence because the trier of fact believed the State's evidence over the defense's evidence. The trier of fact is free to believe all, part, or none of a witness's testimony. *State v. Norris*, 2025-Ohio-1976, ¶ 30 (4th Dist.), citing *State v. Ervin*, 2018-Ohio-3451, ¶ 15 (4th Dist.).

**{¶26}** Based on a review of the witnesses' testimony and the other evidence presented at trial, we do not find that the jury clearly lost its way in concluding the State proved that Willey did not act in defense of another.

**{¶27}** Inmate Rowe testified that the attack was preplanned. Willey, Robbins, and Laywell were planning to attack another inmate and wanted Rowe to pack up their belongings so that the other inmates did not pilfer through and steal things after they were locked up "in the hole" for the fight. Robbins testified that he had demanded that Keeton cover up a tattoo and gave him a week, and then an extension of another day, to allow Keeton to disfigure the tattoo to Robbins' satisfaction. Even though Robbins testified that he had not determined what sort of punishment he would mete out to Keeton while in the restroom, Rowe's testimony was, in essence, that there was going to be a beating.

Although Robbins testified that Keeton, outnumbered in a small, enclosed area, initiated the violence and somehow managed to get Robbins in a chokehold for a period while Willey merely stood by and protested, the jury was free to disbelieve this portion of Robbins' testimony. The jury was free to disbelieve Robbins when he testified that Keeton took the first swing, particularly where Keeton was outnumbered, and his previous tactic had been to negotiate for more time. Robbins testified that Willey attacked Keeton viciously and that Robbins made multiple attempts to stop Willey's assault on Keeton before he succeeded. The beating was so severe that Robbins "freaked out" because Keeton fell to the ground unconscious in a pool of blood and began to convulse. Moreover, Robbins did not testify that he was unable to defend himself and that he believed Willey's actions were necessary for his defense.

{¶28} Trooper Folder's testimony about the group behavior depicted on the videotape was that Laywell appeared to be acting as a "lookout," and when coupled with Rowe's testimony that Laywell told him there was going to be a fight, is further evidence that the beating of Keeton was preplanned. Trooper Folder also testified that Willey left Robbins' bunk area, went to Keeton's bunk, and directed him into the restroom where Robbins was waiting for them and where fights occur because there is no security camera to record inmates' actions.

{¶29} Finally, the letter that Willey wrote to Rowe stated that "we did not mean to kill" Keeton, from which the jury may reasonably infer that Willey and Robbins had premeditated thoughts about injuring Keeton, but not to the point of death.

{¶30} The evidence the State presented shows that Robbins was at fault in creating the situation giving rise to the affray. Robbins had ordered Keeton to mutilate a

tattoo and was planning to beat him in the restroom for failing to follow Robbins' orders. Robbins directed Willey to get Keeton and bring him to the restroom so that the two of them could beat Keeton. They had Rowe pack up their belongings because they anticipated that they would be punished by CCI for their violent actions against Keeton. Moreover, though we need not reach this element, the State also presented evidence that Willey used force that far exceeded the level of force needed to defend Robbins; Willey became the aggressor. Robbins freed himself from Keeton's alleged chokehold early, after which the two could have fled Keeton and the restroom. Instead, Willey continued to assault Keeton until he was unconscious and convulsing, and Robbins was left defending Keeton – pleading with Willey not to kick Keeton while he lay unconscious.

{¶31} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that, in resolving conflicts in the evidence, the trier of fact did not clearly lose its way and create such a manifest miscarriage of justice that reversal of the conviction is necessary. The State introduced evidence to show that (1) Robbins was at fault for creating the situation that led to the affray and (2) Willey went beyond the use of force necessary to defend Robbins and became the aggressor. We overrule Willey's first assignment of error.

### B. Jury Instructions on Defense of Another

{¶32} Willey contends that the trial court erred in providing jury instructions on defense of another. Specifically, he contends that the instructions did not adequately inform the jury of the standard for non-deadly force where there was a factual issue of the level of force used. He argues that "the State's burden is more onerous to disprove self-defense using non-deadly force" and that the "trial court and the parties attempted to

properly instruct the jury on the standards for deadly and nondeadly force" but "they failed to do so." He argues that as a result, "it is likely the jury applied a higher standard than necessary."[1] He also contends the jury instruction implied that Robbins had a duty to retreat where no such duty existed.

**{¶33}** The State argues that Willey did not object to the jury instruction and therefore we review it for plain error. Additionally, because Willey affirmatively agreed that the instruction was correct when asked by the trial court, that State argues that Willey invited the error.

### 1. Standard of Review

**{¶34}** An appellant who fails to object "is precluded from claiming error in the instructions to the jury unless the instructions constitute plain error under Crim.R. 52(B)." *State v. Brock*, 2024-Ohio-1036, ¶ 29 (4th Dist.), citing *State v. McCown*, 2006-Ohio-6040, ¶ 36 (10th Dist.). Crim.R. 52 states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Here, Willey failed to object to the jury instructions before the trial court. Thus, we examine the claimed error under a plain error analysis. The Supreme Court of Ohio has found that an erroneous jury instruction does not meet the plain error threshold unless, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus; *State v. Cunningham,* 2004-Ohio-7007, ¶ 56.

### 2. Legal Analysis

**{¶35}** Here the trial court gave the jury instruction on defense of another and included instructions on the use of both non-deadly and deadly force. After giving the jury

---

[1] In his reply brief, Willey appears to back off this and argue the opposite – that combining the instructions lowered the State's burden in the event any of the jurors found that the force was non-deadly.

instructions to the jury but before the jury retired to deliberate, the trial court held a bench conference. During the conference, the trial court explained that it had determined that both the deadly force and non-deadly force instructions had to be given to the jury and then asked both counsel if they agreed with the case law and the deadly and non-deadly jury instruction the trial court provided. Willey's counsel stated affirmatively that she agreed with the instruction:

> The Court: All right. Counsel, . . . one thing the court wanted to make sure was of record and that's the fact that we incorporated for the defense of others with the deadly and non-deadly force instructions. The court had indicated to counsel before the case of <u>State vs Triplett</u> which is mentioned in OJI stating if there's a factual question about whether the force used was deadly or non-deadly, the court should give the full instructions on deadly force contained in OJI CR 421, 21, as well as non-deadly force, and that's what the court has done. Does counsel still concur that that is the appropriate avenue for presenting the instructions for defense of others?

[Willey's Counsel]: Yes, your honor.

The State argues that Willey invited the error by affirmatively agreeing that the jury instruction as given by the court was appropriate.

**{¶36}** Under the invited error doctrine, "a party is not entitled to take advantage of an error that he himself invited or induced." *State v. Doss*, 2005-Ohio-775, ¶ 5 (8th Dist.), quoting *State ex rel. Kline v. Carroll,* 2002-Ohio-4849, ¶ 27. The doctrine precludes a defendant from making "an affirmative and apparent strategic decision at trial" and then complaining on appeal that the result of that decision constitutes reversible error. *Doss* at ¶ 7, quoting *United States v. Jernigan*, 341 F.3d 1273, 1290 (11th Cir.2003). The doctrine applies when defense counsel is "actively responsible" for the trial court's error. *State v. Campbell*, 90 Ohio St.3d 320, 324, (2000). "[A]n invited error involves the exercise of trial

strategy, and the courts have repeatedly held that an appellate court will not question matters of trial strategy." *Doss* at ¶ 9, citing *State v. Mason*, 82 Ohio St.3d 144, 157(1998).

{¶37} The invited error doctrine as applied to jury instructions is not limited to cases in which the appellant provides the erroneous instructions for the trial court's use, although that is where it commonly arises. It also applies where the appellant affirmatively approves of the instructions after the trial court seeks modifications or corrections to them. In *State v. Olsen*, 2023-Ohio-2254 (11th Dist.), the trial court reviewed the jury instructions with the parties and told the defendant that it had reviewed the relevant case on the "self defense description to use in a dog case" and that based on the case, the court believed the instruction was correctly worded. *Id.* at ¶ 18. After giving the instructions, the trial court asked counsel if the defendant had any corrections or changes and defendant stated that he did not. On appeal, defendant raised an error in the jury instructions on self defense. The appellate court held that defendant had invited any error regarding the jury instructions because defendant had "expressly approved them in their final form." *Id.* at ¶ 39.

{¶38} Similarly in *State v. Sage*, 1990 WL 187278 (Nov. 30, 1990, 6th Dist.), the defendant raised an error in the jury instructions as an error on appeal. The appellate court found not only had the defendant failed to object to the instruction at trial, but that the defendant was barred from complaining under the invited error doctrine. The trial court had submitted the jury instructions and given both parties' counsel the opportunity to object. Instead, the State and defendant's counsel both "stated on the record that they were satisfied with the instructions." *Id.* at *2. "Because appellant expressly approved the jury instructions in the court below and thereby helped induce the error, he cannot now

take advantage of such error on appeal." *Id*. at *3; *State v. Chavez,* 2020-Ohio-426, ¶ 61 (3d Dist.) (finding invited error doctrine applied "because Chavez agreed to the trial court's jury instruction and verdict form"). "Under the doctrine of invited error, where a party expressly accepts a jury instruction, such action serves to waive his right to challenge the accepted instruction on appeal." *United States v. Simmons*, 847 Fed.Appx. 589, 592 (11th Cir. 2021), citing *United States v. Baston*, 818 F.3d 651, 661 (11th Cir. 2016).

**{¶39}** We find that Willey has invited the error of which he now complains. The trial court read the defense of another instructions, discussed the case law and the legal issues, and then directly asked Willey's counsel if she agreed with the defense of another instruction, specifically as it related to deadly and non-deadly force. Willey's counsel stated unequivocally "Yes, your honor." This is particularly true with respect to his argument about the trial court's failure to "adequately distinguish between deadly and non-deadly force." The deadly and non-deadly force components of the defense of others jury instruction is specifically what the trial court was referring to when it sought and received Willey's agreement to the instructions. Willey acknowledged in his brief that this instruction was a joint effort by both parties and the court. He also appears to concede that it may have accrued to his benefit because the jury may have held the State to the higher standard than required by law, which would make it a likely trial strategy by his counsel. The State similarly argues that the jury instructions as written could have accrued to Willey's advantage, because they "place a higher burden on the State, not a lower burden."

**{¶40}** As for Willey's argument that the trial court incorrectly implied that Robbins had "duty to retreat" even in the non-deadly force scenario, we find that, even if we were

to apply a plain error review to this argument, Willey has provided an inaccurate description of the trial court's jury instruction. With respect to the non-deadly force instruction, the trial court instructed, "In determining whether the defendant in using force in defense of another reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety, you may not consider the possibility of retreat by Charles Robbins."[2] The trial court also went on later to instruct the jury that Charles Robbins "had no duty to retreat if he was in a place in which he lawfully had a right to be." These instructions are correct statements of the law.

{¶41} Willey has failed to explain how any purported error in the "duty to retreat" jury instruction meets the plain error threshold. There is no basis to believe that the outcome of the trial clearly would have differed had the jury been instructed that Robbins had no duty to retreat because he was in a place he lawfully had a right to be. This is particularly true here where the evidence presented at trial was undisputed that Robbins was in the restroom of a prison where he was legally permitted to be and neither party argued that the duty to retreat was violated. We find no prejudice to Willey from any purported error in the duty to retreat instruction. *See State v. Cassano*, 2002-Ohio-3751, ¶ 71-77 (over defense counsel's objection, trial court's self-defense jury instruction included inmate's duty to retreat from inmate's own locked cell; Supreme Court of Ohio held that the instruction was erroneous but appellant could show no material prejudice because inmate was at fault in creating the situation leading to the affray and inmate repeatedly stabbed victim after victim ceased to pose any conceivable threat thus no reasonable jury would have believed inmate acted in self-defense).

---

[2] This instruction is from 2 CR OJI 421.191 non-deadly force, comment 9 citing *State v. Koss*, 49 Ohio St.3d 213 (1990).

**{¶42}** We overrule Willey's second assignment of error.

### C. Proximate Cause of Death

**{¶43}** For his third and fourth assignments of error, Willey contends that his conviction of involuntary manslaughter lacked sufficient evidence and was against the manifest weight of the evidence because the State did not prove that Willey's conduct was the proximate cause of Keeton's death. He argues that there were several hours that passed between his altercation with Keeton and Keeton's death and there was no testimony that he struck a lethal blow. He also argues that the medical examiner could not attribute the death to the assault because there were medical factors, intervening events, and the possibility of other assailants.

**{¶44}** The State argues that Willey's own written statement that "we didn't mean to kill him" is legally sufficient evidence to show proximate cause because Willey "certainly is in the best position to know where he struck the victim and with what force." The State further argues that the deputy coroner testified that Keeton's death was caused by blunt force trauma to the lower left abdomen and could have resulted from either a boot or from a fall after being knocked unconscious; this evidence provided further proof that Willey's assault caused Keeton's death.

### 1. Standards of Review

**{¶45}** In reviewing the sufficiency of the evidence to support a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A sufficiency assignment of error challenges the legal adequacy of

the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 2019-Ohio-395, ¶ 13 (4th Dist.). "That limited review does not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Musacchio v. United States*, 577 U.S. 237, 243 (2016). We will not overturn a conviction based on insufficient evidence "'unless reasonable minds could not reach the conclusion that the trier of fact did.'" *State v. Cook*, 2019-Ohio-4745, ¶ 15 (4th Dist.), quoting *State v. Bradshaw*, 2018-Ohio-1105, ¶ 15 (4th Dist.).

**{¶46}** In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56 (1988), syllabus; *State v. Harvey*, 2022-Ohio-2319, ¶ 24 (4th Dist.). Because a trier of fact sees and hears the witnesses, appellate courts will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.); *State v. Colonel*, 2023-Ohio-3945, ¶ 50-54 (4th Dist.).

**{¶47}** Although we may determine that a judgment of a trial court is sustained by sufficient evidence, we may nevertheless conclude that the judgment is against the weight of the evidence. However, generally, it is the role of the jury to determine the weight and

credibility of evidence. "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.).

### 2. Legal Analysis

**{¶48}** Willey was convicted of involuntary manslaughter in violation of R.C. 2903.04(A) and R.C. 2903.11(A). R.C. 2903.04(A) provides: "No person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." The predicate felony here was felonious assault in violation of R.C. 2903.11, which provides: "(A) No person shall knowingly . . . [c]ause serious physical harm to another . . . ." The reference to "proximate result" in R.C. 2903.04(A) means proximate cause. *State v. Crawford*, 2022-Ohio-1509, ¶ 15.

**{¶49}** Willey challenges the causation element of involuntary manslaughter.

Under well-established criminal law principles, causation consists of both actual cause and proximate cause.

Additionally, Ohio appellate courts routinely state that "[t]he term 'proximate result' in the involuntary manslaughter statute involves two concepts: causation and foreseeability."

In general, to "cause" another person's death means to commit "an act or failure to act which in a natural and continuous sequence directly produces the death of a person, and without which, it would not have occurred." Moreover, "[c]onduct is the cause of a result if it is an event, but for which the result in question would not have occurred." Taken together, these two principles mean that a homicide defendant's conduct ordinarily must be "the but-for cause of" the person's death.

When, however, one or more causes contribute to a person's death, the existence of other causes does not negate the defendant's conduct so long as the defendant's "act or failure to act was one cause." In these circumstances, the defendant's "act or omission can be considered a cause in fact if it was a 'substantial' or 'contributing' factor in producing the result." In other words, "[t]here is no but-for cause of harm when independently sufficient causes of that harm coincide." Thus, "a defendant

can still be held criminally responsible where the defendant's conduct combined with other occurrences to jointly result in a legal injury." (Citations and footnote omitted.) (Brackets in original.)

*State v. Platt*, 2024-Ohio-1330, ¶ 37-40 (4th Dist.).

**{¶50}** Here there was evidence that Willey severely beat Keeton to the point of unconsciousness and convulsions. Robbins testified that, when he and Keeton were intertwined, he could sense Willey striking Keeton about the body from behind because he felt Keeton's body jar and move from Willey's assaults. Robbins also testified that Willey's assault was ruthless, and Robbins repeatedly pushed Willey, at least two to three times, to get him to stop pummeling Keeton. Robbins also testified that Willey "was about to stomp him with his boot" but Robbins claims he was able to push Willey away to prevent him from stomping Keeton as he lay collapsed on the restroom floor in a pool of blood, unconscious and convulsing. Even though Robbins claims he stopped Willey from stomping on Keeton with his boots, there was evidence of a boot imprint on Keeton's body, the video showed the Willey was alone in the restroom for an additional four seconds after Robbins exited, the video showed Willey had changed out of his boots after the altercation, and his boots were never found.

**{¶51}** Although Willey contends there was "zero testimony" that Willey punched Keeton's ribs, spleen area, back, or torso, there was an abundance of other evidence he did so. The photographs and testimony from medical witnesses showed that Keeton had bruising and other contusions and trauma about his face, neck, upper torso, and mid-back area and in the area on his left side where his spleen was located. The deputy coroner testified that the trauma related to Keeton's spleen area caused a ruptured spleen and subsequent bleeding and that the cause of death was internal bleeding from blunt

force trauma to the torso, which could have been either from an assault or from a fall, including a fall caused from being knocked unconscious. There was no evidence, either by testimony or by video tape, that any other individuals assaulted Keeton or that he suffered any other falls other than the one in the restroom as Willey beat him unconscious.

{¶52} Willey argues that the State failed to account that Willey acted in defense of another or that there were "multiple hours and multiple intervening acts" that occurred between the altercation and Keeton's death. We have already rejected his defense of another when we addressed his first assignment of error. Willey argues that the intervening acts were the "falls" Keeton allegedly suffered. However, the nurse testified that Keeton only told her of one fall, which was in the restroom. Similarly, Lt. Ward testified that Keeton consistently told him that his injuries were due to a fall. There was no other testimony that Keeton fell multiple times and Willey provided no citation to the record, and we can find none, of multiple falls by Keeton.

{¶53} Willey also contends that several hours passed from the time of the altercation and Keeton's death and the State failed to prove that nothing else during that time caused Keeton's deadly injuries. Willey argued that 28 men went in and out of the restroom while Keeton was in it and there was no testimony from any of them. However, the correctional officers testified that they performed an investigation, reviewed hours of security footage, and interviewed multiple inmates. The only narrative that emerged from the investigation was that Willey and Robbins planned to assault Keeton in the restroom and Willey assaulted Keeton brutally, as testified to by Robbins. The security video shows Keeton exiting the restroom holding his face and neck area and going back to his bunk area. The investigators reviewed hours of security footage and found no other evidence

of anyone else in an altercation with Keeton or of Keeton falling. Willey had access to the same security footage and presented no evidence from any of the footage in his defense, and specifically nothing that would support his claims of a possible intervening cause. The only evidence of Keeton's actions following the assault was correctional officer testimony that he was witnessed later coughing up blood and unresponsive in his bunk.

**{¶54}** Willey's contention that there was some intervening force that inflicted additional injuries upon Keeton is wholly speculative and entirely unsupported by the record.

**{¶55}** Willey argues that his case is nearly identical to *State v. Watson,* 2006-Ohio-6052 (6th Dist.). However, the facts in *Watson* are markedly different. In *Watson*, a woman called 911 to report that a man was beating a woman in the alley near her home. When officers responded about eight minutes later, they found Watson and the victim, Debbie Stout, emerging from the alley laughing and holding hands. The officer testified that both Watson and Stout denied an altercation, and Stout appeared to be neither disheveled nor injured. Twenty-two hours later, a friend of Stout found her deceased in a motel room. In the interim, between when Stout was last seen with Watson and when she was discovered deceased, Stout had visited several taverns, visited at least one or two male friends, and had one of her male friends rent the motel room for her and provide her with vodka and cigarettes. The appellate court concluded that the evidence was insufficient to show proximate cause because even though the 911 caller testified that she saw Watson punch Stout, "if wholly credited" the only area of the body the 911 caller said that Watson had struck Stout was in the front because she was backed up against a garage. The court found no evidence that Watson struck her in the spleen area of her

torso. After the alleged altercation with Watson, Stout walked around town to several taverns with at least one other male friend. "Stout was characterized in testimony as an alcoholic, a prostitute and sometime crack cocaine user: all risk enhancing attributes. There are long unaccounted for periods between the incident in the alley and Stout's death during which she could have been injured by someone else or injured herself." *Id*. at ¶ 53. The appellate court found that in addition to that, there was no evidence that Watson struck Stout in a manner that would result in injuries to her spleen. *Id.*

**{¶56}** Here, we have testimony that Willey savagely beat Keeton about the head and body until he fell violently to the floor, snapping the back of his head on a restroom stall and collapsing on the floor in a "heap of blood" and convulsing. Unlike in *Watson*, there was evidence that Willey had struck Keeton in a manner that would have injured his spleen. This altercation occurred at approximately 3:30 p.m. Keeton's actions upon leaving the restroom were on the prison security camera where he was seen returning to his bunk area. Keeton was under constant surveillance as correctional officers and security cameras surveilled Keeton the next three hours, when he was seen by the nurse at 6 p.m. Keeton remained under video surveillance in his bunk area for another two hours until approximately 8 p.m., when a correctional officer discovered him unresponsive in his bunk and he was transported to the CCI infirmary. Photographs of Keeton's injuries were taken by the nurse during the 8 p.m. visit. From there he was immediately transported to the Adena Regional Medical Center emergency room where he was treated and at approximately 11 p.m. he was life-flighted to OSU Medical Center, where he died at approximately 4:30 a.m. the following morning. Therefore, unlike Stout, who freely walked the streets and taverns without guards or surveillance cameras tracking her after the

alleged altercation with Watson, Keeton's activities upon leaving the restroom were constantly monitored and his condition was first noted by medical staff approximately two hours after the assault. Keeton's injuries were documented by photographs approximately four hours after he left the restroom. Stout's activities were never monitored, and she was discovered deceased almost a day after the alleged assault. Unlike Stout, there were no "long unaccounted for periods" between Willey's assault of Keeton and Keeton's death. Keeton was confined to a prison, was under constant surveillance, and was in his bunk area in the hours following the assault. Nor were there random, unknown individuals with possible access to Keeton like there were with Stout. This incident occurred in the prison restroom and all persons with access to Keeton could be seen and identified on the video footage and were locked inside the facility. Correctional officers conducted a full review of the video footage and an investigation and interview of inmates of interest.

{¶57} In addition, we find that the deputy coroner's report provides further evidence that Willey caused Keeton's death. Keeton died from blood loss due to a ruptured spleen caused by blunt force trauma to his torso. The deputy coroner could not determine what type of force was applied to Keeton and testified that the injuries could be the result of blunt force trauma from a fall or from an assault. The State presented evidence that Willey inflicted blows to Keeton's torso and that his repeated pummeling of his head area caused him to fall to the ground from loss of consciousness. Thus, regardless of which form of trauma may have caused Keeton's spleen to rupture, the evidence was that Willey had inflicted both forms.

{¶58} After viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond

a reasonable doubt. There was not a significant amount of unaccounted for time between Willey's assault of Keeton and his death. And Willey concedes that Robbins testified that Willey landed blows against the back of Keeton during the altercation and that Robbins testified that Willey's continuous blows to the head caused Keeton to collapse unconsciously to the floor. Either the blunt force trauma from the fall or from the assault could have ruptured Keeton's spleen, according to the deputy coroner.

**{¶59}** We also find that Willey's conviction was not against the manifest weight of the evidence. In resolving conflicts in the evidence, the jury did not clearly lose its way and create such a manifest miscarriage of justice that reversal of the conviction is necessary. Sufficient evidence supports the conviction, and the conviction was not against the manifest weight of the evidence. Accordingly, we overrule the third and fourth assignments of error.

## IV. CONCLUSION

**{¶60}** We overrule the assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
Michael D. Hess, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**